586 A.2d 226

UNADILLA SILO CO., INC., A NEW YORK CORPORATION, IN ITS OWN NAME AND AS ASSIGNEE OF ECO BRIDGE, INC., AND/OR B & W CONTRACTORS, INC., PLAINTIFF–APPELLANT, v. HESS BROTHERS, INC., NORTH AMERICAN REINSURANCE COMPANY, A NEW YORK CORPORATION, FIDELITY AND DEPOSIT COMPANY OF MARYLAND, A MARYLAND CORPORATION, AND SKANDIA AMERICA REINSURANCE COMPANY, A DELAWARE CORPORATION, DEFENDANTS–RESPONDENTS, AND STATE OF NEW JERSEY, DEFENDANT.

Argued September 25, 1990—Decided February 28, 1991.

*Ronald Reichstein* argued the cause for appellant.

*Jeffrey M. Garrod* argued the cause for respondents (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys; *Jeffrey M. Garrod* and *Daniel R. Guadalupe,* on the brief).

*Paul P. Mathews* submitted a letter in lieu of brief on behalf of respondent Hess Brothers, Inc., in defense of the Fourth Count of the Complaint. (*Gennet and Kallmann,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The sole issue before us is whether a supplier of specially-fabricated goods is a "subcontractor" on a public-works project pursuant to the New Jersey Bond Act (the Bond Act), *N.J.S.A.*

2A:44–143 to –147, thereby entitling those who supply labor or materials to that supplier to recover under the bond for sums not received.

Hess Brothers, Inc. (Hess), the general contractor on a public construction project, contracted with Eco Bridge, Inc. (Eco) for Eco to supply noise-barrier panels. Unadilla Co., Inc. (Unadilla) fabricated the noise-barrier panels and supplied them to Eco. Hess paid Eco, but Eco failed to pay Unadilla. Unadilla sought recovery under the payment bond, contending that Eco was a "subcontractor" under the Bond Act, entitling Unadilla to payment under the bond as a supplier to a subcontractor. In granting defendants' motion for summary judgment, the trial court concluded that Eco was merely a materialman and not a subcontractor, because it did not perform work at the job site. Consequently, the trial court held that Unadilla, as a supplier of materials to a materialman, could not recover under the payment bond. The Appellate Division affirmed in an unpublished opinion.

We granted Unadilla's petition for certification, 118 *N.J.* 180, 570 *A.*2d 950 (1989).

## I.

The material facts in this case are undisputed. In February 1983, the State of New Jersey, Department of Transportation (the "State" or "DOT"), entered into an agreement with Hess concerning the construction of an interstate roadway.

Pursuant to the provisions of the Bond Act, *N.J.S.A.* 2A:44–143 to –147, Hess secured a payment bond from Fidelity and Deposit Company of Maryland, North American Reinsurance Corporation, and Skandia America Reinsurance Corporation (the sureties), for the respective amounts of $8,577,800, $3,509,-159, and $3,509,159. The Bond Act requires that the bond obligate the sureties to pay all unpaid claims for labor and materials incurred by the contractor, and all subcontractors, in connection with the work. *N.J.S.A.* 2A:44–143. The language

of the bond was substantially similar to the form set forth in *N.J.S.A.* 2A:44–147, providing that it was "for the benefit of any subcontractor, materialman, laborer, person, firm, or corporation having a just claim." The sureties' liability would not be triggered unless Hess failed to

> pay all lawful claims of subcontractors, materialmen, laborers, persons, firms or corporations, for labor performed or materials, provisions, provender or other supplies, or teams, fuels, oils, implements or machinery furnished, used or consumed in the carrying forward, performing or completing of the agreement.

Pursuant to the terms of the bond, Hess and the sureties were obligated to indemnify the State fully for "all suits and actions of any kind or character."

In February 1984, Hess entered into an agreement to purchase from Eco 81,060 noise-barrier panels and accompanying materials for the price of $580,505. The agreement stated that the materials were to be made in strict accordance with the specifications for the project and other specifications promulgated by DOT. In turn, Eco contracted to purchase the noise-barrier panels from Unadilla. Hess subsequently hired B & W Contractors, Inc. (B & W) to install the noise barriers along the side of the roadway.

DOT's normal practice was to inspect the fabrication and treatment of noise-barrier panels. Because of Unadilla's qualifications and membership in the American Institute of Timber Construction (AITC), DOT agreed to waive the inspection requirement if Unadilla filed a certificate of compliance with DOT specifications.

Moreover, DOT's regulations then provided that when a general contractor sought to "sublet" work with a contract value of $25,000 or more, that "proposed subcontractor" had to be "properly classified" in accordance with *N.J.A.C.* 16:44–1.1 to –1.7. *See N.J.A.C.* 16:33–1.1(c) (*repealed by R.* 1989, d. 505). Specifically, the general contractor must furnish a statement to DOT concerning the subcontractor's "financial ability, adequacy of plant and equipment, organization and prior experience, and such other pertinent and material facts as may be desirable."

*N.J.A.C.* 16:44–1.2(a). DOT did not require Hess to furnish such a statement regarding either Unadilla or Eco.

Pursuant to its agreement with Eco and the project specifications, Unadilla fabricated glue-laminated panels for the sound wall. The panels were custom made to fit the contours of the ground along the highway, each panel consisting of at least three layers of one- or two-inch random-width lumber. Unadilla glued the individual layers into panels approximately twenty-two to twenty-three inches wide. The layers were staggered so that the exterior layers overlapped the interior layers. In addition, reinforcing boards had to be glued horizontally at the ends of all three-ply panels. Cross bands were added to panels over fifteen feet high. Because the work required a substantial amount of routing and planing on the panels, Unadilla purchased a machine at a cost of $35,000 for that purpose, which it allegedly used for work only on that job. After the panels had been glued, Unadilla shipped them to Sherburne, New York, for preservative treatment.

The treated panels were then either delivered to or picked up by Eco, who assembled the twenty-two to twenty-three-inch panels into sections eight-feet wide by mechanically attaching the panels to each other and adding laminated wooden posts to each end of the sections. Eco then delivered the panels to the job site in New Jersey. At no time did either Eco or Unadilla perform work on the job site.

In February 1984, Eco and Hess executed a Release of Liens, in which Eco released Hess from liens associated with the materials provided. Under its contract with Hess, DOT required the release of liens before it would pay Hess for the materials. Eco sent Hess a letter dated April 9, 1984, acknowledging Eco's indebtedness to Unadilla for the noise-barrier panels. The letter further specified that Eco was solely responsible for satisfying that indebtedness and that Hess was not contractually obligated to Unadilla.

On April 10, 1984, without verifying that Unadilla had been paid, Hess paid a total of $492,872 for the noise-barrier panels, paying $315,478 to Eco and $177,392 to Lincoln First Bank, Eco's assignee. The remainder of the $580,505 purchase price was never paid. Eco subsequently became insolvent and failed to pay Unadilla.

The noise-barrier panels had been stored at the job site awaiting installation, but B & W never installed them. In June 1984, the noise-barrier panels were destroyed by fire; thereafter, Hess secured new noise-barrier panels elsewhere.

In May 1985, B & W and Eco assigned to Unadilla any claims they had against Hess, in the approximate amount of $100,000.

Unadilla duly filed notices of claims against the State and the sureties under the Bond Act, *see N.J.S.A.* 2A:44–145, and notices of liens against the State under the Municipal Mechanics' Lien Law. *See N.J.S.A.* 2A:44–132. In December 1987, Unadilla filed a complaint against Hess, the sureties, and the State for monies due for the labor and materials furnished in connection with the manufacture of the noise-barrier panels. Unadilla alleged that the State was contractually liable; that Hess and the sureties were liable under the payment bond to Unadilla directly, and as assignee of Eco and B & W; that Hess and the State were liable under the Municipal Mechanics' Lien Law to Unadilla directly, and as assignee of Eco and B & W; and demanded an accounting concerning Hess's dealings with Eco and B & W and judgment on any amounts found to be due under the accounting.

The State moved for summary judgment, arguing that the Bond Act obligated Hess and the sureties to indemnify the State. The trial court granted the State's motion, which Unadilla did not oppose. Subsequently, Hess and the sureties moved for summary judgment. The motion was supported by references to a deposition of John F. Van Cott, president of Unadilla, in which Van Cott stated that he considered both Unadilla and Eco to be materialmen. The trial court dismissed all counts

arising out of the assignments from Eco and B & W, because Eco had released Hess from all liens and Unadilla conceded that Hess owed B & W no money. Relying on *Morris County Industrial Park v. Thomas Nicol Co.,* 35 *N.J.* 522, 173 *A.*2d 414 (1961), and *West Bank Oil v. Hartford Accident and Indemnity Co.,* 205 *N.J.Super.* 56, 500 *A.*2d 32 (App.Div.1985), the trial court also dismissed the remaining counts. It held that because neither Unadilla nor Eco had performed work at the job site, Unadilla was a supplier to a materialman, and as such not entitled to protection under the Bond Act, *N.J.S.A.* 2A:44–143 to –147. Unadilla appealed, and the Appellate Division affirmed substantially on the basis of the Law Division's opinion.

## II.

### A.

Other than the Bond Act, the statutory scheme protecting suppliers of material or labor on construction projects is comprised of the Mechanics' Lien Law, *N.J.S.A.* 2A:44–64 to –124, and the Municipal Mechanics' Lien Law, *N.J.S.A.* 2A:44–125 to –142. Mechanics' lien laws in New Jersey date back to as early as 1820. *L.* 1820, *p.* 124. Under the present Mechanics' Lien Law, an unpaid supplier of labor or materials may assert a lien against the property enhanced by such labor or materials. See *N.J.S.A.* 2A:44–66. Early cases held that a materialman or laborer could assert a lien under the Mechanics' Lien Law against *money* owed to a contractor by a public body, but that lien would not attach to the public improvement. *See Frank v. Board of Chosen Freeholders,* 39 *N.J.L.* 347, 350–51 (Sup.Ct. 1877); *Shannon v. Mayor of Hoboken,* 37 *N.J.Eq.* 123, 126–27 (Ch.), *aff'd,* 37 *N.J.Eq.* 318 (E. & A. 1883).

In 1891 and 1892, the Legislature enacted the antecedents of the present Municipal Mechanics' Lien Law. *L.* 1891, *c.* 225, and *L.* 1892, *c.* 232. Those statutes specifically provided laborers or materialmen with the right to assert a lien on funds in

the municipality's control that had not yet been paid to the contractor. Initially, it was held that the 1892 act did not repeal the right of laborers or materialmen to bring an action against a public body under the general Mechanics' Lien Law. *Arzonico v. Board of Educ.*, 75 *N.J.L.* 21, 22, 69 *A.* 450 (Sup.Ct.1907). In 1909, however, the Legislature amended the statute, *L.* 1909, *c.* 171, § 7, and this Court held that that amendment indicated the Legislature's "intention that the act of 1892 should be the sole means for acquiring a mechanics' lien because of any public improvement." *Key Agency v. Continental Casualty Co.*, 31 *N.J.* 98, 106, 155 *A.*2d 547 (1959); *accord Board of Educ. v. Tait*, 81 *N.J.Eq.* 161, 162, 86 *A.* 379 (E. & A. 1913).

The Legislature enacted the present Municipal Mechanics' Lien Law in 1918, *L.* 1918, *c.* 280, which applies to public-improvement contracts in which a "county, city, town, township, public commission, public board or other municipality" is the contracting party. *N.J.S.A.* 2A:44–126. That law, however, does not protect laborers or materialmen on a public-works project where the *State or its agencies* are the contracting party. *See Morris County Indus. Park v. Thomas Nicol Co.*, *supra*, 35 *N.J.* at 528, 173 *A.*2d 414; *Hoffman Builders Supply v. Stein*, 96 *N.J.Eq.* 241, 242, 125 *A.* 566 (Ch.1924); *Curtis & Hill Gravel & Sand Co. v. State Highway Comm'n*, 91 *N.J.Eq.* 421, 432–33, 111 *A.* 16 (Ch.1920).

In the same year in which it enacted the Municipal Mechanics' Lien Law, the Legislature also enacted the Bond Act. *L.* 1918, *c.* 75. Because the Municipal Mechanics' Lien Law did not apply to State contracts, the sole avenue of recourse for laborers and materialmen on State public-works projects, prior to passage of the Bond Act, was against the contractor. In a statement accompanying the enactment of the Bond Act, the Legislature recognized that the Bond Act was intended to remedy that situation:

This act is designed to protect laborers and materialmen who do work on public buildings for a general contractor. Under the present law it is very difficult for

them to collect their claims in case the contractor refuses to pay them, and this act would require the contractor to give a bond conditioned not only for the proper completion of the work, but also for the payment of all claims of laborers or materialmen. [*Ibid.* (Sponsor's Statement to A.270).]

Under the Bond Act, whenever any type of public-works construction is to be performed, the State, county, municipality, or school district that contracts out the work must require the contractor to furnish a bond. *N.J.S.A.* 2A:44–143. Such a bond is to ensure

payment by the contractor, and by all subcontractors, for all labor performed or materials, provisions, provender or other supplies, teams, fuels, oils, implements or machinery used or consumed in, upon, for or about the construction, erection, alteration or repair of such buildings, works or improvements. [*Ibid.*]

The bond shall be

in an amount equal to at least 100 per cent of the contract price, and shall be conditioned for the payment by the contractor, and by all subcontractors, or his or their subcontractor, of all indebtedness which may accrue to any person, firm or corporation, in an amount not exceeding the sum specified in the bond. [*N.J.S.A.* 2A:44–144.]

Further, whenever the contracting public entity pays money to the contractor, the Trust Fund Act, *N.J.S.A.* 2A:44–148, provides that that money shall constitute a trust fund in favor of unpaid laborers and materialmen. The Trust Fund Act, however, protects only those parties who may proceed against the payment bond required by the Bond Act. *Key Agency v. Continental Casualty Co., supra,* 31 *N.J.* at 105, 155 *A.*2d 547.

Although the Bond Act requires a bond to secure "payment by the contractor, and by all subcontractors," *N.J.S.A.* 2A:44–143, for any materials provided on a public-works project, it does not define "subcontractor." In the Municipal Mechanics' Lien Law, however, a "subcontractor" is defined as

a person having a contract under a contract for the performance of the same work, or any specified part thereof, and also a person having such a contract with a subcontractor, for the performance of the same work or any specified part thereof. [*N.J.S.A.* 2A:44–126.]

We have previously held that the Bond Act and Municipal Mechanics' Lien law are "*in pari materia* and are to be construed together." *Morris County Indus. Park v. Thomas Nicol Co., supra,* 35 *N.J.* at 526–27, 173 *A.*2d 414.

## B.

This Court first defined "subcontractor" for the purposes of the Bond Act in *Morris County, supra*. In that case, the plaintiff supplied dirt from its pit to L.G. Kitchell, Inc. (Kitchell), who in turn supplied the dirt to the defendant, Thomas Nicol Co., the general contractor on a construction project of the defendant, New Jersey Turnpike Authority. The defendant Nicol paid Kitchell, but Kitchell never paid the plaintiff. The plaintiff then sued Nicol and the Turnpike Authority, seeking to recover under either the Municipal Mechanics' Lien Law or the Bond Act.

The plaintiff in *Morris County* argued that any materialman on a public work is entitled to protection under the Bond Act. In rejecting that argument, we held that the language of the Bond Act does not extend protection to suppliers of material to materialmen. *Id.* at 529–33, 173 *A.*2d 414. Rather, the only materialmen entitled to benefit from the Bond Act are those that supply either a contractor or subcontractor. *Ibid.* The plaintiff argued alternatively that Kitchell should be classified as a subcontractor, asserting that the plaintiff would therefore be entitled to recover under the bond as a materialman to a subcontractor. The Court rejected that argument, reasoning that Kitchell was not a subcontractor because it performed no work on the job site nor fabricated any special materials for the job, citing for support out-of-state cases involving contracts for the supply of materials analogous to dirt. *Id.* at 534–35, 173 *A.*2d 414. The Court noted, however, that

> [w]e are not here concerned with the possibility of classifying as a subcontractor a supplier who does some processing or fabrication of the materials off the work site prior to delivery. [*Id.* at 535, 173 *A.*2d 414.]

Because the Court held that Kitchell was merely a materialman, it denied the plaintiff recovery under the bond.[1]

---

[1] Other jurisdictions are virtually unanimous in holding that a materialman's materialman is not entitled to recover under the contractor's payment bond. See *MacEvoy Co. v. United States ex rel. Tomkins Co.*, 322 *U.S.* 102, 107–08, 64

Following *Morris County*, the scope of the term "subcontractor" for purposes of the Bond Act was next considered in *West Bank Oil v. Hartford Accident and Indem. Co., supra*, 205 *N.J.Super.* 56, 500 *A.*2d 32. In *West Bank*, the Appellate Division rejected a claim made under the Bond Act by a supplier of liquid asphalt. The plaintiff had sold liquid asphalt to Cumberland Asphalt Company (Cumberland), which in turn sold its finished product to the paving contractor. Neither the plaintiff nor Cumberland performed work at the job site. As in *Morris County*, the Appellate Division distinguished the case before it from cases in which a supplier "provided a unique

S.Ct. 890, 893–94, 88 *L.Ed.* 1163, 1168 (1944); *Theisen v. County of Los Angeles,* 54 *Cal.*2d 170, 177–178, 352 *P.*2d 529, 534, 5 *Cal.Rptr.* 161, 165 (1960); *Lovell Clay Prods. v. Statewide Supply Co.,* 41 *Colo.App.* 166, 168, 580 *P.*2d 1278, 1280 (1978); *LaGrand Steel Prods. v. A.S.C. Constructors,* 108 *Idaho* 817, 818, 702 *P.*2d 855, 856 (Ct.App.1985); *Thurman v. Star Elec. Supply,* 307 *So.* 2d 283, 286 (La.1975); *Atlantic Sea–Con, Ltd. v. Robert Dann Co.,* 321 *Md.* 275, 289–92, 582 *A.*2d 981, 988–89 (1990); *James D. Shea Co. v. Perini Corp.,* 2 *Mass.App.* 912, 913, 321 *N.E.*2d 831, 832 (1975); *Weyerhaeuser Co. v. Twin City Millwork Co.,* 291 *Minn.* 293, 297, 191 *N.W.*2d 401, 403 (1971); *Lyle Signs, Inc. v. Evroks Corp.,* 132 *N.H.* 156, 158, 562 *A.*2d 785, 787 (1989); *Farwest Steel Corp. v. Mainline Metal Works,* 48 *Wash.App.* 719, 722, 741 *P.*2d 58, 60 (1987). *But see Richards and Conover Steel Co. v. Nielsons, Inc.,* 755 *P.*2d 644, 650 (Okla.1988) (court allowed materialman of third-tier subcontractor to recover and inferred that any materialman, no matter how remote, can recover against payment bond). Further, the vast majority of jurisdictions has held that a materialman's materialman may not recover under the State's mechanics' lien statute. *See, e.g., Schneider v. J.W. Metz Lumber Co.,* 715 *P.*2d 329, 332–33 (Colo.1986); *Georgia–Pacific Corp. v. Dan Austin Props.,* 126 *Ga.App.* 191, 191, 190 *S.E.*2d 131, 132, *aff'd,* 229 *Ga.* 803, 194 *S.E.*2d 472 (1972); *City of Evansville v. Verplank Concrete & Supply,* 400 *N.E.*2d 812, 819 (Ind.Ct.App.1980); *Wickes Corp. v. Coleman Village, Inc.,* 111 *Mich.App.* 115, 118, 314 *N.W.*2d 541, 543 (1981); *Ideal Basic Indus. v. Juniata Farmers Coop. Ass'n,* 205 *Neb.* 611, 613–18, 289 *N.W.*2d 192, 194–96 (1980); *Ronald A. Coco, Inc. v. St. Paul's Methodist Church,* 78 *N.M.* 97, 100, 428 *P.*2d 636, 639 (1967); *Kingston Trust Co. v. State,* 57 *Misc.* 2d 55, 56, 291 *N.Y.S.*2d 208, 210 (Sup.Ct.1968); *Botzum Bros. Co. v. Brown Lumber Co.,* 104 *Ohio App.* 507, 509, 150 *N.E.*2d 485, 487 (1957); *American Bldgs. Co. v. Wheelers Stores,* 585 *P.*2d 845, 848 (Wyo.1978); *see also* Annotation, *Right of Subcontractor's Subcontractor or Materialman, or of Materialman's Materialman to Mechanics' Lien,* 24 *A.L.R.* 4th 963, 996 (1983)

product." 205 *N.J.Super.* at 64, 500 *A.*2d 32. The Appellate Division characterized the material supplied by Cumberland as merely a "specific grade of a standard product which * * * readily could have [been] obtained elsewhere." *Id.* at 65, 500 *A.*2d 32. Acknowledging that the materials supplied were of a standard type, the plaintiff urged the court to adopt the expansive definition of subcontractor used by the United States Supreme Court in *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 *U.S.* 116, 94 *S.Ct.* 2157, 40 *L.Ed.*2d 703 (1974). In that case, the Court defined a subcontractor as "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." *Id.* at 123, 94 *S.Ct.* at 2162, 40 *L.Ed.*2d at 710 (quoting *MacEvoy Co. v. United States ex rel. Tomkins Co.*, 322 *U.S.* 102, 109, 64 *S.Ct.* 890, 894, 88 *L.Ed.* 1163, 1168 (1944)). The Appellate Division rejected that argument, and instead construed *Morris County* "to more narrowly define the group whose debts can be enforced by allowing liens or claims against the contractor's bond." *West Bank Oil v. Hartford Accident and Indem. Co., supra,* 205 *N.J.Super.* at 64, 500 *A.*2d 32.

## C.

A number of jurisdictions, including the federal courts, have considered the issue before us. The majority has recognized that an off-site manufacturer of fabricated materials may be a subcontractor even though it does not work on the construction site. *See F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., supra,* 417 *U.S.* at 123–24, 94 *S.Ct.* at 2162, 40 *L.Ed.*2d at 710–11; *United States ex rel. Consolidated Pipe and Supply Co. v. Morrison–Knudsen Co.,* 687 *F.*2d 129, 132–36 (6th Cir.1982); *United States ex rel. Hardwood Prods.*

---

(citations of cases recognizing that materialman's materialman not entitled to mechanics' lien). *But see* Annotation, *supra,* 24 *A.L.R.* 4th at 994.

*Corp. v. John A. Johnson & Sons,* 137 *F.Supp.* 562, 564 (W.D.Penn.1955); *Theisen v. County of Los Angeles,* 54 *Cal.* 2d 170, 183–84, 352 *P.*2d 529, 537–38, 5 *Cal.Rptr.* 161, 169–70 (1960); *Pinecrest Apartments v. R.P. McDavid Co.,* 535 *So.* 2d 126, 128–29 (Ala.1988); *LaGrand Steel v. A.S.C. Constructors,* 108 *Idaho* 817, 818–19, 702 *P.*2d 855, 856–57 (Ct.App.1985); *Robintech v. White & McNeil Excavating,* 218 *Mont.* 404, 406, 709 *P.*2d 631, 633 (1985); *Lyle Signs v. Evroks Corp.,* 132 *N.H.* 156, 160, 562 *A.*2d 785, 788 (1989). Some jurisdictions, however, have held that because a supplier of materials did not install those materials on the job site, it could not be classified as a subcontractor. *See City of Evansville v. Verplank Concrete & Supply,* 400 *N.E.*2d 812, 820 (Ind.Ct.App.1980); *American Bldgs. Co. v. Wheelers Stores,* 585 *P.*2d 845, 847 (Wyo.1978). Other courts, although not requiring on-site work, have considered such work as one factor in determining whether a supplier of materials is a subcontractor. *See Aetna Casualty & Surety Co. v. United States ex rel. Gibson Steel Co.,* 382 *F.*2d 615, 618 (5th Cir.1967); *Farwest Steel Corp. v. Mainline Metal Works,* 48 *Wash.App.* 719, 726, 741 *P.*2d 58, 62 (1987). Among the factors courts have considered in determining whether a material supplier is a subcontractor are the percentage of the total job contracted out to the supplier, the amount of custom manufacturing required, and the fungibility of the materials supplied. Depending in part on the applicable statute, some courts have also required a contractual relationship between the material supplier and the prime contractor. *See J.W. Bateson Co. v. United States ex rel. Board of Trustees,* 434 *U.S.* 586, 590, 98 *S.Ct.* 873, 875, 55 *L.Ed.*2d 50, 55 (1978); *Pinecrest Apartments v. R.P. McDavid Co., supra,* 535 *So.*2d at 128–29; *Theisen v. County of Los Angeles, supra,* 54 *Cal.*2d at 184, 352 *P.*2d at 538, 5 *Cal.Rptr.* at 170; *Kinney Elec. Mfg. Co. v. Modern Elec. Co.,* 149 *N.W.*2d 69, 72 (N.D.1967). *But see Home Indem. Co. v. Battey Mach. Co.,* 109 *Ga.App.* 322, 324, 136 *S.E.*2d 193, 195 (1964); *Atlantic Sea–Con, Ltd. v.*

*Robert Dann Co.*, 321 *Md.* 275, 279–82, 582 *A.*2d 981, 983–84 (1990).

■ Cases in the federal courts have considered whether a party is a subcontractor for purposes of the Miller Act, 40 *U.S.C.* §§ 270a to 270d, the federal analogue of our Bond Act. Under the Miller Act, only those parties who contract directly with the prime contractor or a "subcontractor" are entitled to recover under the bond. *MacEvoy Co. v. United States ex rel. Tomkins Co., supra*, 322 *U.S.* at 107–08, 64 *S.Ct.* at 893–94, 88 *L.Ed.* at 1168. Those in more remote relationships, including persons supplying labor or materials to a materialman, are not protected. *Ibid.* Further, under the Miller Act, only those in privity with the prime contractor may be subcontractors. *J.W. Bateson Co. v. United States ex rel. Board of Trustees, supra*, 434 *U.S.* at 590, 98 *S.Ct.* at 875, 55 *L.Ed.*2d at 55. In *MacEvoy*, the Court found a subcontractor to be "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, * * * excluding ordinary laborers and materialmen." *MacEvoy, supra*, 322 *U.S.* at 109, 64 *S.Ct.* at 894, 88 *L.Ed.* at 1168. The plaintiff in *MacEvoy* had not been paid for building materials it had sold to a supplier of the prime contractor. Neither the plaintiff nor its customer had performed work on the job site. Because the Court held that the plaintiff's customer performed no function beyond that of an ordinary materialman, the plaintiff, as a supplier to a materialman, could not claim under the bond. The Court explained the reason for denying relief to suppliers of materialmen:

> The relatively few subcontractors *who perform part of the original contract* represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors. But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer. [*Id.* at 110, 64 *S.Ct.* at 895, 88 *L.Ed.* at 1169 (citations omitted) (emphasis added).]

The Supreme Court readdressed the issue in *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., supra*, 417 *U.S.* 116, 94 *S.Ct.* 2157, 40 *L.Ed.*2d 703. In that case, the general contractor on a federal housing project had awarded two contracts to Cerpac Co., one to supply and install all millwork on the project, and the other to supply all exterior plywood. Cerpac contracted to purchase the plywood from Industrial Lumber Co., the party seeking payment under the bond. In determining whether Cerpac was a subcontractor, the Court construed *MacEvoy* to have adopted a functional rather than a technical standard for determining whether one is a subcontractor. *Id.* 417 *U.S.* at 123, 94 *S.Ct.* at 2162, 40 *L.Ed.*2d at 710. The Court stated that the "test for whether one is a subcontractor" looks to "the substantiality and importance of his relationship with the prime contractor." *Ibid.* The Court held that Cerpac was a subcontractor, because it "took over a substantial part of the prime contract itself." *Id.* at 124, 94 *S.Ct.* at 2162, 40 *L.Ed.*2d at 711. Although in *F.D. Rich* the claimant's customer had actually performed on-site work, other federal courts have classified off-site fabricators as subcontractors. *See, e.g., United States ex rel. Consolidated Pipe and Supply Co. v. Morrison–Knudsen Co., supra*, 687 *F.*2d at 135 (pipe manufacturer who supplied $5,537,072 of fabricated pipe on $260,996,400 job held to be subcontractor); *Miller Equip. Co. v. Colonial Steel and Iron Co.*, 383 *F.*2d 669, 674 (4th Cir.1967) (where amount due steel supplier represented 15% of total contract and 64% of cost of all steel supplied, steel supplier was deemed to be subcontractor), *cert. denied*, 390 *U.S.* 955, 88 *S.Ct.* 1049, 19 *L.Ed.*2d 1148 (1968); *United States ex rel. Wellman Eng'g Co. v. MSI Corp.*, 350 *F.*2d 285 (2d Cir.1965) (classifying as subcontractor company responsible for manufacturing and supplying hydraulic system for opening and closing roofs of missile site).

The majority of state courts that have addressed this issue have defined the term "subcontractor" functionally, applying a test that examines the totality of the circumstances arising out

of the contract. See *supra* 123 *N.J.* at 280–282, 586 *A.*2d at 233. *Theisen v. County of Los Angeles, supra,* 54 *Cal.* 2d 170, 352 *P.*2d 529, 5 *Cal.Rptr.* 161, and *Lyle Signs v. Evroks Corp., supra,* 132 *N.H.* 156, 562 *A.*2d 785, exemplify that functional approach. In *Theisen,* the general contractor agreed to purchase custom-made doors from Petterson Corporation (Petterson), who in turn contracted to purchase those doors from Durand. Neither Petterson nor Durand performed work at the job site. The applicable statute in *Theisen* provided that when a claim was filed by a materialman and disputed by the contractor, the public disbursing officer would withhold monies unless the contractor filed a bond. That remedy, known as a "stop-notice procedure," was available to one who supplied materials to a subcontractor, but "not available to those whose relationship to the work is only that of a vendor of materials to a materialman." *Theisen v. County of Los Angeles, supra,* 54 *Cal.* 2d at 177, 352 *P.*2d at 534, 5 *Cal.Rptr.* at 166. When Petterson failed to pay, Durand attempted to invoke the stop-notice procedure. In order to determine whether the stop-notice procedure was available to Durand, the California Supreme Court had to determine whether Petterson was a subcontractor. Concluding that Petterson should be classified as a subcontractor because of the significance of its contract, the Court observed that

the essential feature which constitutes one a subcontractor rather than a materialman is that in the course of performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such contract, *not that he enters upon the job site and does the construction there.* * * * We do not accept the view * * * that to be a subcontractor one must install work at the site of the improvement. Rather, we conclude that one who agrees with the prime contractor to perform a substantial specified portion of the work of construction which is the subject of the general contract in accord with the plans and specifications by which the prime contractor is bound * * * is a subcontractor although he does not undertake to himself incorporate such portion of the projected structure into the building. [54 *Cal.*2d at 183–84, 352 *P.*2d at 537–38, 5 *Cal.Rptr.* at 169–70 (citations omitted) (emphasis added).]

In *Lyle Signs v. Evroks Corp., supra,* 132 *N.H.* 156, 562 *A.*2d 785, the plaintiff supplied materials to Standard Signs Co.

(Standard), who in turn furnished the general contractor with roadway signs. Standard did not install the signs or work at the job site. The general contractor paid Standard, but Standard never paid the plaintiff. The plaintiff brought an action seeking to recover under the contractor's bond, contending that Standard was a subcontractor. Although remanding the case for retrial due to an insufficient record, the New Hampshire Supreme Court set forth an expansive test to determine whether an entity is a subcontractor:

> [C]ourts should look, in part, to the following factors: (1) Whether the entity constructs a definite and substantial part of the work or improvement called for in the original contract; (2) whether the work is performed in accordance with plans and specifications of the original contract; and (3) whether the plans and specifications call for a unique product and not a product readily available on the open market. Lastly, we note that the work need not be done at the job site for one to be considered a subcontractor. [132 *N.H.* at 160–61, 562 *A.*2d at 788.]

### III.

At the outset, we reaffirm the holding in *Morris County* that a supplier to a materialman does not come within the ambit of the Bond Act.[2] The Bond Act requires that the bond "be conditioned for the payment by the contractor, and by all subcontractors, or his or their subcontractor, of all indebtedness." *N.J.S.A.* 2A:44–144. Thus, only indebtedness incurred by the contractor or any subcontractor must be covered under the bond. Indebtedness incurred by materialmen to their suppliers of material or labor is not within the scope of the Bond Act, the Act affording protection only to materialmen that supply either the contractor or a subcontractor. Thus, if Eco is a subcontractor, Unadilla is entitled to recover its claim under the bond.

---

[2]We note that the bond secured by Hess does not specifically limit its coverage only to those materialmen that supply either a contractor or subcontractor. However, because that bond conforms substantially to the statutorily-recommended form, *see N.J.S.A.* 2A:44–147, we construe the coverage of the bond in a manner consistent with the requirements of the Bond Act.

Defendants argue that New Jersey's case law requires that an entity perform on-site work to be deemed a subcontractor. They point to language in *Morris County*, where the Court determined that the definition of subcontractor in the Municipal Mechanics' Lien Law, *N.J.S.A.* 2A:44–126, was also intended to be used for purposes of the Bond Act:

The emphasis is, of course, on the subcontractor being engaged to do all or some part of the *work*, i.e., the construction itself, involving at least some labor in the installation of materials and not merely the supplying of materials. [*Morris County Indus. Park v. Thomas Nicol Co., supra*, 35 *N.J.* at 534, 173 *A.*2d 414.]

■ In our view, *Morris County* did not address the issue before us, because the claimant in that case supplied dirt, a fungible materiald requiring no off-site fabrication and no on-site installation. We consider significant the phrase "for the performance of the same work" in the Municipal Mechanics' Lien Law's definition of subcontractor. *N.J.S.A.* 2A:44–128. A supplier of dirt or similar material does not perform part of "the same work" that the prime contractor is obligated to perform merely by providing part of the material the contractor uses in performing its contract. In contrast, a supplier whose contract involves material integral to the principal contract, requiring substantial off-site or on-site fabrication before it can be installed, may be significantly involved in the performance of "the same work" undertaken by the prime contractor. As the Supreme Court observed in *MacEvoy, supra*, such suppliers may be said to "represent * * * the prime contractor and are well known to him." 322 *U.S.* at 109, 64 *S.Ct.* at 894, 88 *L.Ed.* at 1168. Hence, it is not unreasonable to expect that the prime contractor, being familiar with the protections afforded by the Bond Act, will withhold payment from such suppliers until presented with documentation evidencing that their material-men and laborers have been paid.

■ Defendants also note that Unadilla's president, in his deposition, described both Unadilla and Eco as materialmen, contending that if Unadilla does not consider Eco to be a

subcontractor, neither should this Court. In our view, Unadilla's self-classification is not controlling, especially because the terms "subcontractor" and "materialman" may be interpreted differently, depending on the context in which they are used. *See Lyle Signs v. Evroks Corp., supra,* 132 *N.H.* at 158, 562 *A.*2d at 787 (middle party described itself as a material supplier in correspondence to general contractor); *cf. United States ex rel. Consolidated Pipe and Supply Co. v. Morrison–Knudsen Co., supra,* 687 *F.*2d at 134 (fact that contractual instrument was styled "purchase order" not controlling on question whether supplier was subcontractor or materialman); *United States ex rel. Gulfport Piping Co. v. Monaco and Son, Inc.,* 222 *F.Supp.* 175, 180–81 (D.Md.1963) (although government engineer's telegram referred to middle party as material supplier, court disregarded statement and looked to substance of contract), *rev'd on other grounds,* 336 *F.*2d 636 (4th Cir.1964).

■ We also note defendants' argument that because DOT did not require Hess to submit a statement concerning Eco's fitness as a "proposed subcontractor," Eco should not be treated as a subcontractor under the Bond Act. The purpose of DOT's regulations, however, is to ensure that the proposed subcontractor is able to meet its financial obligations and is qualified to provide the materials or labor. We also observe that under DOT's regulations proposed subcontractors that provide labor and materials with a value less than $25,000 did not have to qualify with DOT, *see N.J.A.C.* 16:33–1.1(c), but the Bond Act nevertheless requires that their obligations be covered by the payment bond. The purpose of the regulations relied on by defendants is to ensure that construction projects are of a quality commensurate with DOT standards and specifications, not to determine coverage of the payment bond.

■ In determining whether a supplier of materials is a subcontractor within the meaning of the Bond Act, we apply a functional standard considering, among others, the following factors: (1) whether the material supplier agreed to perform a

definite and substantial part of the same work that the general contractor was obligated to perform; (2) whether the work was performed according to plans and specifications in the original contract; and (3) whether the materials required off-site fabrication prior to installation at the job site. Further, a subcontractor protected by the Bond Act must have agreed to provide labor or materials for either the general contractor or one of its subcontractors. *See N.J.S.A.* 2A:44–126; *N.J.S.A.* 2A:44–144. Although on-site work may be a factor in determining whether the material supplier performed a definite and substantial amount of the work called for in the original contract, on-site work is not a prerequisite to subcontractor status.

The Law Division's decision that Unadilla was not protected by the Bond Act was made without considering the functional standard we now adopt in determining whether a material supplier is to be deemed a subcontractor under the Act. Hence, we remand the matter to the Law Division to determine that issue, affording the parties the opportunity to supplement the record if necessary. Accordingly, we reverse the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN–7.

*Opposed*—None.