796 A.2d 919 (2002)
351 N.J. Super. 2
Elizabeth VELEZ, assignee of Jose Vargas, and Irving Velez, Plaintiffs-Appellants,
v.
WILKERSON ELECTRICAL SERVICES, INC., NOBE/BCC Associates, Defendant/Third Party Plaintiff, and
Chubb Insurance Co., successor in interest to Federal Insurance Co., individually, jointly and severally, Defendant/Third Party Plaintiff-Respondent,
v.
QEM Enterprises, Inc., Third Party Defendant, and
New Jersey Housing Mortgage Finance Agency, Third Party Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 17, 2002.
Decided May 14, 2002.
*920 John M. Esposito, East Hanover, argued the cause for appellants.
Stefani C. Schwartz, Florham Park, argued the cause for respondent Chubb Insurance Co., successor in interest to Federal Insurance Co. (Schwartz Simon Edelstein Celso & Kessler, attorneys; Stephen C. Edelstein, of counsel; Ms. Schwartz and Christopher R. Welgos, on the brief).
Michael J. Spina, Deputy Attorney General, argued the cause for respondent New Jersey Housing and Mortgage Finance Agency (David Samson, Attorney General, attorney; Michael Haas, Assistant Attorney General, of counsel; Mr. Spina, on the brief).
Before Judges BAIME, FALL and AXELRAD.
The opinion of the court was delivered by FALL, J.A.D.
This case involves application of the time-limitation periods set forth in the New Jersey Public Works Bond Act (Bond Act), N.J.S.A. 2A:44-143 to -148, to the prevailing-wage claims by employees of a subcontractor against the bonding company that issued a payment and performance bond to the general contractor of a public works project funded through the New Jersey Housing Mortgage Finance Agency (NJHMFA).
On September 30, 1998, plaintiff, Elizabeth Velez (Elizabeth), assignee of Jose Vargas,[1] filed a complaint against defendants, Wilkerson Electrical Services, Inc. (Wilkerson), Nobe/BCC Associates (Nobe), and Chubb Insurance Co., successor in interest to Federal Insurance Co. (Federal), for failure to pay prevailing wages for labor performed on a public works project known as "Rehab 753-759 Clinton Ave., Ebon Sq., New Construction 87-89 Wakeman Sq." (Project). Jose was employed by Wilkerson and performed services as an electrician on the Project until February 11, 1996. Specifically, the Project was for the rehabilitation of the Ebon Square Housing Project for its owner, Nobe Urban Renewal Development Corporation. The Project was funded by NJHMFA. Nobe was the general contractor on the project; Wilkerson was a subcontractor of Nobe.
On April 19, 1994, Federal, as Surety, provided Nobe, as principal, a payment *921 and performance bond for the project pursuant to the version of the Bond Act then in effect. The bond recognized that on December 23, 1993, Nobe had entered into a written contract with Nobe Urban Renewal Development Corporation, as Owner, for the construction, repair or improvement of a housing project, and that NJHMFA, as Lender, had agreed to lend the Owner monies to be secured by a mortgage on the project, which money will be used to make payments to Nobe under the terms of the contract. The bond provided, in pertinent part:
Now, if [Nobe] shall well and faithfully do and perform all of the things agreed by it to be done and performed according to the terms of the Contract, and shall pay all lawful claims or subcontractors, materialmen, laborers, persons, firms or corporations for labor performed or materials, provisions, provender or other supplies or teams, fuels, oils, implements or machinery furnished, used or consumed in the carrying forward, performing or completing of the Contract, we agreeing and assenting that this undertaking shall be for the benefit of any subcontractor, materialman, laborer, person, firm or corporation having a just claim, as well as for the Obligees herein then this obligation shall be void; otherwise the same shall remain in full force and effect; it being expressly understood and agreed that the liability of the surety for any and all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated.
By letter to Vargas dated October 28, 1997, the Public Contracts Section of the Division of Workplace Standard in the Department of Labor, in conducting an audit of the Project, advised Vargas the required wage rate for an electrician on the subject public works site was $26.53 per hour, including fringe benefits, and that its investigation revealed that Vargas "may have been paid less than the above prevailing wage rate and that a balance of $24,093.88 may be due [him] as a result of the above." A similar letter, also dated October 28, 1997, was sent to plaintiff, Irving Velez, advising Velez that he "may have been paid less than the ... prevailing wage rate and that a balance of $21,402.74 may be due [him] as a result[.]" Velez was also employed by Wilkerson as an electrician on the Project and worked thereon until May 11, 1996.
By letter to Federal dated May 6, 1998, the Public Contracts Section forwarded a "Bonding Company Lien Claim" for failure of Wilkerson to pay the proper prevailing wage rate on the Project.
By letter to the Department of Labor dated August 24, 1998, Vargas advised that it was his understanding he was "entitled to receive a monetary payment that was due [him] at the time of [his] resignation from [Wilkerson]."
By letter to Vargas dated September 8, 1998, the Public Contracts Section enclosed a wage claim form, advising, in pertinent part:
If your final decision is to go to a formal hearing, via our office, please be advised that there is a $10,000.00 threshold. Since our audit indicated you could be due $24,093.88, all monies above $10,000.00 would be waived.
Some other courses of action that you could take are as follows:
1. You could obtain your own attorney at your expense.
2. You could contact the bonding company of the general contractor, Nobe/BCC Associates, since our office put a lien against the contractor on May 6, 1998.
*922 In her complaint, Elizabeth claimed that Wilkerson had only paid Vargas $8.00 per hour for his work on the Project as an electrician. Elizabeth sought the sum of $24,093.88 as the sum lawfully due to Vargas based upon the prevailing wage of $36.53 that should have been paid to him. The complaint contended that Wilkerson owed the aforesaid sum, but that Nobe, as general contractor, and Federal, as surety under the bond, were responsible for said sum.
On August 20, 1999, an order was executed permitting the filing of an amended complaint, adding Velez as a plaintiff.
On or about September 15, 1999, Nobe and Federal filed an answer and asserted a crossclaim against Wilkerson and a third-party complaint against QEM Enterprises (QEM), the entity contracted by the NJHMFA to provide contract maintenance, including payroll services, on the Project, and against NJHMFA. The third-party complaint alleged that Wilkerson would submit its payroll requests to QEM, which QEM certified and presented to NJHMFA. Thereafter, NJHMFA would submit payroll checks to Wilkerson to disseminate to its employees, including Jose and Irving. The third-party complaint alleges that if improper payments were made, those actions were as a consequence of the actions of QEM and NJHMFA.
Plaintiffs then moved for entry of summary judgment. Federal and Nobe cross-moved for summary judgment, contending that the failure of Vargas and Velez to comply with the time-limitation provisions contained in the Bond Act barred their action.
The motions were argued in the Law Division on March 14, 2000. Counsel for Federal contended the one-year limitation period set forth in N.J.S.A. 2A:44-146 precluded plaintiffs' action. The judge denied plaintiffs' motion for summary judgment and adjourned Federal's summary judgment motion.
Thereafter, Velez submitted a certification stating that he was unaware that Wilkerson was required by law to pay him the prevailing wage, nor was he aware that a bond had been posted. Velez also stated he had not received the October 28, 1997 letter from the Department of Labor because by then he had moved to Florida. Vargas also submitted a certification, asserting that he did not receive the October 28, 1997 letter from the Department of Labor because he was incarcerated at the Hunterdon County Jail at that time. Vargas stated that when he eventually discovered, through a fellow former Wilkerson employee, that he had a prevailing wage claim, he telephoned the Department of Labor and then wrote the referenced August 24, 1998 letter.
A Federal employee certified that Federal's first knowledge of any prevailing wage claims on the Project was in May 1998 when it received the May 6, 1998 letter from the Department of Labor.
The cross-motions of Federal and Nobe for summary judgment were argued on May 8, 2000. Plaintiffs argued that the one-year limitation period set forth in the current version of N.J.S.A. 2A:44-146, which was adopted effective August 24, 1996, was inapplicable to plaintiffs' claims, and that the statute was unconstitutionally vague. The motion judge rejected plaintiffs' constitutional attack to the validity of N.J.S.A. 2A:44-146, as amended, and reserved decision on the remaining issues. On June 2, 1996, the judge placed his decision on the record. Relying principally on Salesian Soc'y v. Formigli Corp., 120 N.J.Super. 493, 295 A.2d 19 (Law Div. 1972), aff'd, 124 N.J.Super. 270, 306 A.2d 466 (App.Div.1973), the motion judge found *923 that plaintiffs' failure to file their claims against Federal within one year from completion of their work on the Project precluded their action pursuant to N.J.S.A. 2A:44-146. An order granting summary judgment in favor of Federal was executed on June 2, 2000. A second order was entered on June 19, 2000, clarifying that the complaint was dismissed as to both Federal and Chubb.
On appeal, plaintiffs present the following arguments for our consideration:
POINT I
THE TRIAL COURT INCORRECTLY APPLIED A STATUTE OF LIMITATIONS THAT CAME INTO BEING AFTER THE PLAINTIFFS STARTED AND FINISHED THEIR WORK AND AFTER THE PREVAILING WAGE ACT VIOLATIONS OCCURRED.
POINT II
EVEN IF THE REVISED BOND ACT APPLIED TO THE PLAINTIFFS, THE PLAINTIFFS SHOULD HAVE RECEIVED THE BENEFIT OF THE DISCOVERY RULE.
POINT III
THE PUBLIC WORKS BOND ACT IS UNCONSTITUTIONAL.
"The Bond Act has existed in various forms for almost eighty years[,]" and was first enacted by L. 1918, c. 75. Board of Trs. v. L.B.S. Constr., 148 N.J. 561, 576, 691 A.2d 339 (1997), cert. denied, sub nom., International Fidelity Ins. Co. v. Board of Trs. of Operating Eng'rs Local 825 Fund Serv. Facilities, 522 U.S. 861, 118 S.Ct. 163, 139 L.Ed.2d 107 (1997). Prior to passage of the Bond Act,
the sole avenue of recourse for laborers and materialmen on State public-works projects ... was against the contractor. In a statement accompanying the enactment of the Bond Act [in 1918], the Legislature recognized that the Bond Act was intended to remedy that situation:
This act is designed to protect laborers and materialmen who do work on public buildings for a general contractor. Under the present law it is very difficult for them to collect their claims in case the contractor refuses to pay them, and this act would require the contractor to give a bond conditioned not only for the proper completion of the work, but also for the payment of all claims of laborers and materialmen.
[Unadilla Silo Co. v. Hess Bros., 123 N.J. 268, 276-77, 586 A.2d 226 (quoting from Sponsor's Statement to A-270 in L. 1918, c. 75).]
Clearly, the Bond Act is "designed to protect public agencies, laborers, and material suppliers who work on public projects from the insolvency of a general contractor." L.B.S. Constr., supra, 148 N.J. at 576, 691 A.2d 339; see also Quayle v. Tri-Con of North Jersey, 295 N.J.Super. 640, 643, 685 A.2d 988 (App.Div.1996) (holding that the Bond Act, like the Prevailing Wage Act, is remedial legislation and is designed to offer broad protection to unpaid workers).
The Bond Act underwent significant revision by the enactment of L. 1996, c. 81, effective August 24, 1996. The prior version of N.J.S.A. 2A:44-146 provided:
If the indebtedness due to any person as shown by the statement required to be filed by section 2A:44-145 of this title shall not be paid in full at the expiration of 80 days from the acceptance of the building work or improvement by the duly authorized board or officer, such person may, within 1 year from the date of such acceptance, bring an action in his own name upon the bond required by this article.
*924 Effective August 24, 1996, N.J.S.A. 2A:44-146 provides the following limitation period for institution of actions:
If the indebtedness due to any person as shown by the statement required to be filed by N.J.S. 2A:44-145 shall not be paid in full at the expiration of 90 days from the date of notice of the amount due to the person, such person shall, within 1 year from the last date that work was performed or materials were supplied by that person, bring an action in his own name upon the bond required by this article.
Prior to the 1996 revisions, N.J.S.A. 2A:44-145 required the person making the claim against the surety on the bond to furnish the surety a statement of the amount due within 80 days after acceptance of the building, work or improvement "by the duly authorized board or officer[.]" Effective August 24, 1996, N.J.S.A. 2A:44-145 now requires that a beneficiary under the Bond Act furnish the surety his or her statement of the amount due "at any time before the expiration of one year from the last date upon which such beneficiary shall have performed actual work[,]" and that
[n]o action shall be brought against any of the sureties on the bond ... until the expiration of 90 days after provision to the sureties and the contractor of the statement of amount due to him, but in no event later than one year from the last date upon which such beneficiary shall have performed actual work or delivered materials to the project.

[N.J.S.A. 2A:44-145.]
Accordingly, prior to the August 24, 1996 amendments, the one-year limitation period ran from the date the work on the public works contract was accepted; the August 24, 1996 amendments provide that the one-year limitation period runs from the last date that the work was performed by the beneficiary.
Additionally, the 1996 amendments added the following requirement in the opening paragraph of N.J.S.A. 2A:44-145:
Any person who may be a beneficiary of the payment bond, as defined in this article, and who does not have a direct contract with the contractor furnishing the bond shall, prior to commencing any work, provide written notice to the contractor by certified mail or otherwise, ... that said person is a beneficiary of the bond. If a beneficiary fails to provide the required written notice, the beneficiary shall only have rights to the benefits available hereunder from the date the notice is provided.

[Emphasis added.]
This notice requirement was recently discussed by Judge Hoens in Laborers # 779 v. American Cas. Co., 339 N.J.Super. 345, 771 A.2d 712 (Law Div.2000). There, in a public-works project where a payment bond was furnished in accordance with the requirements of Bond Act, two labor unions submitted bond claims for fringe benefits unpaid by the masonry services subcontractor relating to the subcontractor's union workers who had commenced their work on the project in February 1998, and completed their work on the project in November 1998. The claim on the bond was not made against the surety until March 1999, and the notice prior to the commencement of any work, as required by the first paragraph of N.J.S.A. 2A:44-145, was not provided. Id. at 347-48, 771 A.2d 712. In considering applicability of the pre-work notice provision as a bar to the claims of the labor unions, the judge discussed its purpose as follows:
[T]his aspect of the Bond Act was amended in 1996. That amendment was part of a much larger re-examination of *925 legislation governing the construction industry and the assertion of claims generally in the construction context. One of the significant goals of those amendments was the reduction of uncertainties concerning claims and claimants which plagued the construction industry and, by extension, the surety industry. As [the surety] notes, the lack of a notice requirement and the general imprecision in the claims process led to overpayment, to duplicative claims and to significant uncertainty. While as a practical matter, for example, the general contractor and its surety knew in general the identities of subcontractors, they often knew little of the existence, let alone the identities, of the subcontractors' own subs, or their suppliers or materialmen. As a result, the amended notice provision served, in the first instance, to identify potential claimants and beneficiaries in a uniform and organized fashion.

[Id. at 351-52, 771 A.2d 712.]
We concur with Judge Hoens' conclusion that one of the goals of the 1996 amendments to the Bond Act was to clearly define the risk assumed by the surety issuing the bond. See Sponsor Statement to A-1034, adopted June 17, 1996. The 1996 statutory scheme outlined by the amended version of N.J.S.A. 2A:44-145 addressed that goal by first, identifying potential beneficiaries under the bond through the required written notice prior to commencement of any work on the public works project; second, by requiring any beneficiary to furnish the surety with a statement of amount due him or her at any time before the expiration of one year from the last date upon which the beneficiary performed actual work on the project; and third, by prohibiting commencement of any action against the surety until the expiration of 90 days after provision to the surety of the statement of amount due, but in no event later than one year from the last date upon which such beneficiary shall have performed actual work on the project.
Such precision was lacking in the pre-1996 version of the Bond Act. See Quayle, supra, 295 N.J.Super. at 642-45, 685 A.2d 988 (discussing the difficulties inherent in determining the date of "acceptance"). Where the work was not accepted "by the duly authorized board of officer," application of the prior versions of N.J.S.A. 2A:44-145 and -146 could leave claims against the sureties open-ended, since the one-year period would not commence until the eventuality of acceptance. Here, for example, there is no contention that the assertion of the prevailing wage bond claims by plaintiff was more than one year after acceptance of the work of the Project.
We conclude that application of the statutory notice and limitation scheme of the current version of the Bond Act to bar plaintiffs' claims was inappropriate. The current requirement contained in N.J.S.A. 2A:44-145 that plaintiffs provide written notice to the contractor that they were beneficiaries of the bond "prior to commencing any work[ ]" came into effect on August 24, 1996, several months after Vargas and Velez had already completed their work on the project. Since Vargas and Velez could not have thereby complied with this pre-work notice provision, we conclude that the Legislature could not have intended that the 1996 amendment, measuring of the one-year limitation period from the date of completion of the work, be applied to prevailing wage claims on public works projects based upon work completed prior to the effective date of the amendments.
The trial court's reliance on Salesian, supra, is misplaced. Salesian involved application of the ten-year limitation period *926 contained in N.J.S.A. 2A:14-1.1, which became effective May 18, 1967, to an action against a contractor and subcontractor to recover damages stemming from building defects where the construction was completed on May 3, 1958. 120 N.J.Super. at 495-96, 295 A.2d 19. The plaintiffs argued, inter alia, that N.J.S.A. 2A:14-1.1 "should be interpreted to apply prospectively only, to construction or services performed after its effective date, namely, May 18, 1967[.]" Id. at 497, 295 A.2d 19. The Salesian court ruled that N.J.S.A. 2A:14-1.1 "should be read prospectively to apply only to actions brought after its effective date." Id. at 502, 295 A.2d 19. However, the court stated:
To say that the Legislature meant to apply the act only to construction completed after its effective date, May 18, 1967, would keep open for ten years, for example, an action for damage due to defective construction completed on or after May 18, 1967. This means that the statute would bar an action for the first time on May 18, 1977. That bar would apply only to construction completed on or after May 18, 1967. Such an interpretation would mean that claims for damage against contractors and architects of construction completed before May 18, 1967 would be left open for an unlimited period of time, except as governed by existing statutes of limitations.... In my opinion the Legislature did not intend to bar only actions which are filed after May 17, 1977. The statute does apply prospectively, however, to all actions commenced after its effective date in 1967, including this action. In this sense the statute has prevented a cause of action from arising for damage discovered long after the alleged breach of contract or tort was committed, in 1957 or 1958, at the time of construction....

[Id. at 502-03, 295 A.2d 19.]
We are persuaded that Salesian is distinguishable. First, the facts are remarkably different. In Salesian, supra, a building owner brought suit against a contractor and subcontractor, who had constructed the building thirteen years previously, to recover damages for alleged building defects. At the time of completion of the construction in 1957 or 1958, the ten-year limitation period for such tort or contract actions set forth in N.J.S.A. 2A:14-1.1 was not in effect. 120 N.J.Super. at 495-96, 295 A.2d 19. The Salesian court understandably concluded that the Legislature could not have intended that N.J.S.A. 2A:14-1.1 was to apply only to construction completed after its effective date, but rather to suits instituted after its effective date. Here, there is a public policy issue that implicates the remedial purposes of two statutes. The historical and remedial purpose of the Bond Act is to protect, inter alia, laborers who do work on public projects. The Prevailing Wage Act, N.J.S.A. 34:11-56.25 to -56.47, declares that the public policy of this State is "to establish a prevailing wage level for workmen engaged in public works in order to safeguard their efficiency and general well being and to protect them as well as their employers from the effects of serious and unfair competition from wage levels detrimental to efficiency and well-being." N.J.S.A. 34:11-56.25. Moreover, there is an established compliance-monitoring component with public works contracts. This Project was audited by the Department of Labor to assure compliance with all applicable labor laws. According to that audit, plaintiffs were paid a wage less than the required prevailing minimum wage for the work they performed. The Department of Labor then notified plaintiffs and, thereafter, Federal. To mechanistically apply in this case the principle of statutory interpretation properly applicable *927 to contractor and subcontractor liability for construction defects set forth in Salesian gives no recognition to the statutory and public policy context of the facts in this case.
Additionally, we conclude that the inclusion of a pre-work notification requirement in the 1996 version of N.J.S.A. 24:44-145 evinces an intent that the substantive change in application of the one-year limitation period was not intended to apply to claims based upon work completed prior to the effective date of the 1996 revisions.
In light of our conclusion, we need not address the remaining issues raised by plaintiffs.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] The record reflects that Elizabeth Velez is the fiancé of Vargas, who assigned his prevailing-wage claim to Elizabeth.