WEYERHAEUSER COMPANY v. TWIN CITY
MILLWORK COMPANY AND OTHERS.
WATSON CONSTRUCTION COMPANY AND
ANOTHER, APPELLANTS.

191 N. W. (2d) 401.

October 15, 1971—No. 42671.

294

*Faegre & Benson, Gordon G. Busdicker,* and *Arthur L. Doten,* for appellants.

*Briggs & Morgan* and *Philip L. Bruner,* for respondent.

*Carlsen, Greiner & Law, Charles E. Carlsen,* and *Timothy M. O'Brien,* for Associated General Contractors of Minnesota, amicus curiae.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Rogosheske, JJ.

OTIS, JUSTICE.

Plaintiff, Weyerhaeuser Company, has sued and recovered against the prime contractor and its surety on a contractor's bond for millwork which it furnished in the construction of an addition to a building on the University of Minnesota campus. The principal issue is whether the record permits a finding that Twin City Millwork Company, with whom plaintiff contracted, was a subcontractor under the prime contractor, Watson Construction Company, or was simply a materialman. We have concluded that the trial court was justified in finding that Twin City Millwork Company was a subcontractor, and affirm.

At the outset we note that the issue presented is close and difficult. A brief on behalf of appellants has been filed by Associated General Contractors of Minnesota as amicus curiae. They seek a narrow construction of the applicable statutes which we are not prepared to furnish. We are satisfied from an examination of the authorities that each case must hinge on the totality

of the surrounding circumstances and none lends itself to hard-and-fast rules which may be inflexibly applied. With this principle in mind, we would have been better satisfied had the matter been thoroughly litigated rather than disposed of by summary judgment. The parties, however, did not press the lower court for a trial on the merits but seemed content to submit the matter on affidavits and documentary evidence.

On May 20, 1965, Watson entered a prime contract with the Regents of the University of Minnesota to build an addition to Sanford Hall. With Planet Insurance Company as surety, it furnished the university a contractor's bond in the sum of $765,300 similar in language to that prescribed by Minn. St. 574.26. In the process of construction, Watson entered contracts with 34 subcontractors and materialmen, including Twin City Millwork Company (TCM). Almost half of the work undertaken by this contract was the furnishing of 1,077 wooden doors of various sizes, finishes, and cores. TCM prepared and submitted to the university's architects shop drawings detailing the requirements contemplated by the prime contractor.

Because it did not itself manufacture doors, TCM solicited bids from Weyerhaeuser Company, U. S. Plywood Company, and Hardwood Products. Ultimately, it awarded the contract to Weyerhaeuser. The contract was subsequently amended to call for 1,107 doors for which TCM agreed to pay a total price of $23,611.74. All of the doors were individually made by Weyerhaeuser and delivered to TCM, who took them to the job site for installation by Watson. TCM became bankrupt and Weyerhaeuser has not been paid. It brought this action against Watson and Planet on the contractor's bond. The trial court awarded Weyerhaeuser $23,311.74 on principal and $4,500 attorneys' fees.

■ The relevant portion of the bond furnished by Watson reads thus:

"This obligation is made for the use of the Obligee and of all persons doing work or furnishing skill, tools, machinery or materials, or insurance premiums, or equipment, or supplies for any

camp maintained for the feeding or keeping of men or animals, or any combination thereof, engaged under or for the purpose of the execution of said Contract and may be sued on thereby." [1]

Watson and Planet argue that the reference in the bond to those engaged under "said Contract" refers only to the contract between Watson and the regents. They take the position that TCM was merely a materialman and Weyerhaeuser its supplier. Appellants stress the fact that TCM was to perform no labor on the job site; that a subcontractor is defined in the prime contract as a person supplying labor and material at the site of the project; and that the doors here in question were standard items routinely manufactured rather than custom-built.

Appellants assert that Watson's contract with TCM refers to "materials only" and designates TCM merely as a "vendor." It is further argued that the affidavit of Watson's president compels a finding that persons in TCM's position are universally considered in the industry as materialmen rather than subcontractors. Finally, both appellants and amicus contend that whatever may have been TCM's status, Watson had no notice of TCM's contract with Weyerhaeuser, and therefore Weyerhaeus-

---

[1] Minn. St. 574.26 provides in part as follows: "No contract with the state, or with any municipal corporation or other public board or body thereof, for the doing of any public work, shall be valid for any purpose, unless the contractor shall give bond to the state or other body contracted with, for the use of the obligee and of all persons doing work or furnishing skill, tools, machinery, or materials or insurance premiums or equipment or supplies for any camp maintained for the feeding or keeping of men and animals engaged under, or for the purpose of, such contract, conditioned for the payment, as they become due, of all just claims for such work, tools, machinery, skill, materials, insurance premiums, equipment, and supplies for the completion of the contract in accordance with its terms, for saving the obligee harmless from all costs and charges that may accrue on account of the doing of the work specified, and for the enforcing of the terms of the bond if action is brought on the bond, including reasonable attorney's fees, in any case where such action is successfully maintained and for the compliance with the laws appertaining thereto."

er was in a better position than Watson to protect itself from the possibility of TCM's insolvency. Although there is merit to these arguments, we are persuaded that the weight of authority, and particularly the long-established policy of this state, require an affirmance.

As we have suggested, a basic question is whether the prime contractor can be expected to have notice of plaintiff's participation in the project. There is always a question of whether one who furnishes labor or material is so remote the prime contractor cannot reasonably protect his interest. It is for this reason that some courts have insisted on labor and material being furnished at the job site where the contractor can observe what is being done. The point at which the cutoff is appropriate must necessarily be somewhat arbitrary. Suffice it to say that the almost universal rule permits protection to materialmen who sell to subcontractors but does not allow recovery by those who sell standard products to materialmen.

In Clifford F. MacEvoy Co. v. United States, 322 U. S. 102, 108, 64 S. Ct. 890, 894, 88 L. ed. 1163, 1168 (1944), a leading case which deals with the payment bond required from contractors by §§ 1 and 2 of the Miller Act, 49 Stat. 793, 794, as amended, 40 USCA, §§ 270a and 270b,[2] the United States Supreme Court summarized the problem thus:

"The Miller Act itself makes no attempt to define the word 'subcontractor.' We are thus forced to utilize ordinary judicial

---

[2] 40 USCA, § 270a, provides in part: "(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as 'contractor':

\* \* \* \* \*

"(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person."

tools of definition. Whether the word includes laborers and materialmen is not subject to easy solution, for the word has no single exact meaning. In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor. In that sense Miller was a subcontractor. But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen. * * *

\* \* \* \* \*

"Practical considerations underlying the Act likewise support this conclusion. Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself. The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors. United States v. American Surety Co. [200 U. S. 197, 26 S. Ct. 168, 50 L. ed. 437]; Mankin v. United States [215 U. S. 533, 30 S. Ct. 174, 54 L. ed. 315]. But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer. Many such materialmen are usually involved in large projects; they deal in turn with innumerable sub-materialmen and laborers. To impose unlimited liability under the payment bond to those sub-materialmen and laborers is to create a precarious and perilous risk on the prime contractor and his surety. To sanction such a risk requires clear language in the statute and in the bond so as to leave no alternative. Here the proviso of

§ 2(a) of the Act forbids the imposition of such a risk, thereby foreclosing Tomkins' right to sue on the payment bond."

In construing the Miller Act and applying the principles laid down in MacEvoy, Federal courts have expressed divergent views. In United States v. John A. Johnson & Sons, Inc. (W. D. Pa.) 137 F. Supp. 562 (1955), the court found that a company which contracted to furnish doors for a hospital project was a subcontractor, noting that it undertook to supply items manufactured in accordance with specifications of the prime contract and thereby took over a part of the contract itself. A different result was reached in United States v. Lembke Const. Co. (10 Cir.) 370 F. 2d 293 (1966), and Aetna Cas. & Surety Co. v. United States (5 Cir.) 382 F. 2d 615 (1967). The court in Aetna found significant the extent to which the middle party took over some aspect of the prime contract as well as the complexity of the installation which was to be fabricated. It held that the contract there in question was for standard prefabricated items amounting only to a minor portion of the construction cost. In Lembke, the product furnished was ordinary concrete, and the court discovered no substantial delegation of the prime contract. The court held that regardless of how the parties designated their relationship, whether the middleman was a subcontractor or materialman required a judicial interpretation.[3]

Two other Federal cases deserve comment: United States for Use of Wellman Engineering Co. v. MSI Corp. (2 Cir.) 350 F. 2d 285 (1965); J. W. Cooper Const. Co. v. Public Housing Administration (10 Cir.) 390 F. 2d 175 (1968). In allowing recovery under the Miller Act to a remote supplier, the court in Wellman held the purchaser to be a subcontractor although the company did not perform any work on the job site. There, as in

---

[3] In the general conditions made a part of the prime contract between Watson and the regents, a subcontractor is defined as follows: "A person, firm or corporation supplying labor and materials or only labor for work at the site of the project for, and under separate contract or agreement with, the Contractor."

the instant case, the material furnished was built to specifications and was not generally available on the open market. A similar result was reached in the Cooper case where the items ordered were kitchen cabinets furnished according to plans and specifications.

Massachusetts and California have also passed on the question. Holt & Bugbee Co. v. City of Melrose, 311 Mass. 424, 41 N. E. 2d 562, 141 A. L. R. 319 (1942), involved millwork. Recovery was allowed the remote supplier of lumber notwithstanding the fact the purchaser took no part in the installation of the paneling, rails, newel posts, trim, and stair stock which it built pursuant to contract with the prime contractor. Theisen v. County of Los Angeles, 54 Cal. 2d 170, 5 Cal. Rptr. 161, 352 P. 2d 529 (1960), as in the instant case, involved the manufacture of doors. The California court, relying on two Minnesota cases, Illinois Steel Warehouse Co. v. Hennepin Lbr. Co. 149 Minn. 157, 182 N. W. 994; and Pittsburg Plate Glass Co. v. Sisters of the Sorrowful Mother, 83 Minn. 29, 85 N. W. 829, expressed a view with which we are in accord (54 Cal. 2d 183, 5 Cal. Rptr. 169, 352 P. 2d 537) :

"In our opinion the essential feature which constitutes one a subcontractor rather than a materialman is that in the course of the performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such contract, not that he enters upon the job site and does the construction there. We are not here concerned with the mere furnishing of materials from which doors were to be constructed by the general contractor nor are we interested in the sale of standard stock-in-trade doors. Specifically we are dealing with a contract whereby the doors were to be fabricated according to the specifications of the prime contract and as a constituent part of the construction of the public improvement which was the subject of the contract. We do not accept the view of some other jurisdictions (see annotation, 141 A.L.R. 321) that to be a subcontractor one must install work at the site of the improvement. Rather, we conclude that one who

agrees with the prime contractor to perform a substantial specified portion of the work of construction which is the subject of the general contract in accord with the plans and specifications by which the prime contractor is bound has 'charge of the construction' of that part of the work of improvement * * * and is a subcontractor although he does not undertake to himself incorporate such portion of the projected structure into the building."

Whatever may be the rule elsewhere, Minnesota is committed to a liberal interpretation of both statutes which govern contractors' bonds and laws dealing with mechanics liens. Emery v. Hertig, 60 Minn. 54, 61 N. W. 830; Combs v. Jackson, 69 Minn. 336, 72 N. W. 565; Pittsburg Plate Glass Co. v. Sisters of the Sorrowful Mother, *supra;* Illinois Steel Warehouse Co. v Hennepin Lbr. Co. *supra.*

As applied to the facts in the instant case, those decisions permit, if they do not require, an affirmance. While the amount of Watson's contract with TCM did not represent a substantial portion of the overall project, it was a significant part of the construction. The contract called for 1,107 specially made doors, built with a variety of materials and designs. They were not items which were readily available through ordinary building suppliers. By the very nature of the plans and specifications, Watson was on notice that the doors had to be custom fabricated. The installation by the prime contractor rather than the subcontractor is only one element to be considered and is not decisive. Nor do we find decisive TCM's designation as "vendor" in its contract with Watson. There is no conclusive evidence either of the intention of the parties or of the practice in the trade which would prevent a finding that TCM was a subcontractor.

As we have indicated, the case is not entirely free from doubt. Nevertheless, we have concluded that the trial court's determination is supported by the greater weight of authority and by our own liberal attitude toward the scope of protection afforded by statutory contractors' bonds.

■ Watson challenges the right of the trial court to grant attorneys' fees, claiming that the bond which it furnished was not one required by the statute which authorizes such an award. Since that question was not presented to the trial court, we decline to consider it for the first time on appeal. Accordingly, the judgment is affirmed.

Affirmed.