655 S.E.2d 494

## PREUSSAG INTERNATIONAL STEEL CORPORATION, dba Infra–Metals Co., Plaintiff

### v.

## MARCH–WESTIN CO.; Titan Fabrication & Construction Co.; Zurich American Insurance Co.; and Fidelity Deposit Co. of Maryland, Defendants.

### No. 33286.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 12, 2007.

Decided Nov. 9, 2007.

James F. Companion, Esq., John Porco, Esq., Schrader, Byrd & Companion, PLLC, Wheeling, William K. Kane, Esq., Erin Bolan Hines, Esq., Lovells, Chicago, IL, for Plaintiff.

Rochelle R. Koerbel, Esq., Blumling & Gusky, LLP, Pittsburgh, PA, for Amicus Curiae The Surety & Fidelity Association of America.

William H. Hutchens, III, Esq., Jackson Kelly, PLLC, Morgantown, for March–Westin Co., Inc.

Carl L. Fletcher, Jr., Esq., Daniels Law Firm, PLLC, Charleston, for Amicus Curiae Contractors Association of West Virginia.

STARCHER, J.:

In the instant case we hold that a bond posted to guarantee the payment of those who provide labor and materials for a public building construction project is available to pay a company that provided the raw steel used by another company to custom-fabricate the steel structure of the building.

## I.

### Facts & Background

Pursuant to *W.Va.Code*, 51–1A–3 [1996] (the "Uniform Certification of Questions of Law Act"), the United States District Court for the Northern District of West Virginia has certified a question of law to the Supreme Court of Appeals of West Virginia. We quote from the District Court's order framing the question:

## I. THE QUESTION OF LAW TO BE ANSWERED

Under *W. Va.Code*, 38–2–39 (2004), is a steel fabricator deemed to be a "subcontractor" where:

A. The steel fabricator enters a fixed-price contract with the general contractor of a public works construction project, pursuant to which the fabricator

i. Agrees to fabricate and deliver structural steel components conforming to the construction project's unique design specifications;

ii. Produces shop drawings for the fabricated steel components based on the project's engineering calculations and design specifications;

iii. Submits its shop drawings for approval by the project's architect and general contractor before fabricating the structural steel components; and

iv. Delivers the fabricated steel components on a delivery schedule based on construction progress;

B. The steel fabricator performs all physical fabrication processes at its own facility, away from the project site; AND

C. The fabricated steel components are not fungible and not readily marketable without further modification?

The District Court's order also included the following "Statement of Facts":[1]

On August 25, 2003, Fairmont State College ("FSC") retained MarchWestin Co. ("March") as general contractor to construct a new Student Recreation Center at FSC (the "Project"). The contracted price for the completed Project was $20,210,140. In accordance with *W. Va.Code*, 38–2–39, March obtained a surety Bond through two private surety companies, Zurich American Insurance Co. and Fidelity Deposit Co. of Maryland (the "Sureties"). Subsequently, on September 19, 2003, March and Titan Fabrication & Construction Co. ("Titan") entered into a fixed price contract,[1] wherein Titan agreed to fabricate and deliver $1,204,584 worth of specially fabricated

1. We adopt the terms used by the District Court to identify and refer to the parties in the instant case.

structural steel components required for the Project. In performing its "scope of work,"[2] Titan purchased non-fabricated steel from numerous materialmen, including Preussag International Steel Corp., dba Infra–Metals Co. ("Infra"), the plaintiff in the present controversy. In pertinent part, the record before the court shows that:

A. Titan performed all fabrication at a facility away from the Project site;[3]

B. Titan's material suppliers, including Infra, provided Titan with non-fabricated steel of a general nature;

C. In accordance with the Project's design specifications, Titan worked the raw steel into specially fabricated structural steel components;

D. The specially fabricated steel components were not readily marketable without further modification;

E. Titan's invoices to March separately accounted for various aspects of its scope of work, showing costs of materials supplied by each of Titan's materialmen, including Infra.

F. Titan's inability to deliver the specially fabricated steel would have effectively shut the project down;

G. Infra allegedly supplied $557,264.97 of non-fabricated steel to Titan, for use on the Project, for which it was never paid;[4]

H. Infra filed for payment under the Bond on June 22, 2004;

I. The Sureties denied payment to Infra, claiming that Titan was a "mere materialman" and that Infra is not within the class of persons protected under Bonds issued pursuant to *W. Va.Code,* 38-2-39.

All parties agree that, if Titan is deemed to have been a subcontractor rather than a materialman, then Infra would be entitled to payment under the Bond. Given the facts of this case, both parties agree that whether Titan is a subcontractor or a materialman presents an unsettled question of West Virginia law appropriate for certification. The parties also agree that *Marsh v. Rothey,* [117 W.Va. 94] 183 S.E. 914 (1936), is the leading case construing *W. Va.Code,* 38–2–39. They also agree, however, that

the facts before the *Marsh* court were distinguishable from those now before the court and that the *Marsh* holding is not dispositive of the issue at bar. Nonetheless, Infra contends that the Bond statute, as construed by the *Marsh* court, mandates that one who supplies material that is not of a general type, but instead if worked according to project specifications, is a subcontractor. By contrast, March and the Sureties assert that an entity's status as a materialman or subcontractor is contractually defined, and that, even if such status is not contractually defined, there is nonetheless a requirement that one physically perform work at the Project site to be deemed a subcontractor.

1. [Footnotes to District Court's order] Both the general contract between March and FSC *and* the contract between March and Titan were executed on documents formally entitled "Purchase Orders."

2. Record documents authored and provided by March refer to Titan's role in terms of its "scope of work."

3. The record is silent as to whether any of Titan's duties were performed at the Project site.

4. Titan filed for bankruptcy protection in November 2004 and is currently under a protective stay.

To summarize the facts and central issue of the instant case: March was the general contractor for a twenty-million-dollar public building. March contracted with Titan to fabricate and deliver the steel structural elements of the building, at a price of more than a million dollars. Titan ordered and received raw steel beams, plates, etc. from Infra—but Titan did not pay Infra. Infra, which the parties agree was a "materialman," now seeks payment from the bond posted by March. It is settled law (as we discuss further *infra*) that if Titan was a "subcontractor" on the project, Infra has a right to make a claim against the bond. But if Titan was a mere "materialman," Infra cannot make a claim against the bond.

## II.

### Standard of Review

■ In *Wilson v. Bernet,* 218 W.Va. 628, 631, 625 S.E.2d 706, 709 (2005), this Court said:

The issues presented by the instant matter involve questions of law certified to this Court. When called upon to consider certified questions, we employ a plenary review and review anew the answers provided by the circuit court. "The appellate standard of review of *questions of law* answered and certified by a circuit court is *de novo.*" Syl. pt. 1, *Gallapoo v. Wal-Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996). *See also* Syl. pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of *legal issues* presented by certified question from a federal district or appellate court."); Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998) ("A de novo standard is applied by this Court in addressing the *legal issues* presented by a certified question from a federal district or appellate court.").

(Emphasis added.) [2]

### III.

### *Discussion*

*W. Va.Code*, 38–2–39 [2004], states as follows:

It shall be the duty of the state commissioner of public institutions, and of all county courts, boards of education, boards of trustees, and other legal bodies having authority to contract for the erection, construction, improvement, alteration or repair of any public building or other structure, or any building or other structure used or to be used for public purposes, to require of every person to whom it shall award, and with whom it shall enter into, any contract for the erection, construction, improvement, alteration or repair of any such public building or other structure used or to be used for public purposes, that such contractor shall cause to be executed and delivered to the secretary of such commissioner or other legal body, or other proper and designated custodian of the papers and records thereof, a good, valid, solvent and sufficient bond, in a penal sum equal at least to the reasonable cost of the materials, machinery, equipment and labor required for the completion of such contract, and conditioned that in the event such contractor shall fail to pay in full for all such materials, machinery, equipment and labor delivered to him for use in the erection, construction, improvement, alteration or repair of such public building or other structure, or building or other structure used or to be used for public purposes, then such bond and the sureties thereon shall be responsible to such materialman, furnisher of machinery or equipment, and furnisher or performer of such labor, or their assigns, for the full payment of the full value thereof.

No officer or employee of this state or of any public agency, public authority, public corporation, or other public entity, and no person acting or purporting to act on behalf of such officer or employee or public entity shall require that any surety bond required or permitted by this section be obtained from any particular surety company, agent, broker or producer.

---

**2.** Infra made a motion for summary judgment on the materialman/subcontractor issue in the District Court. The parties filed briefs, affidavits, and exhibits in connection with the summary judgment motion, followed by the District Court's decision to refer a question of law to this Court. This Court has those briefs, affidavits, etc. The parties stipulated to the facts that are recited in the District Court's certified question order, quoted *infra*. After this Court accepted the certified question for review, March created a new affidavit and submitted that affidavit with March's brief to this Court. The new affidavit downplayed the complexity of the structural steel fabrication work that Titan contracted to perform and sought to thereby factually undermine the claim that Titan was a subcontractor whose suppliers could make a claim against March's bond. Although this new affidavit bears the style of the federal court case from which the instant certified question originates, the affidavit was not filed in that court. At oral argument before this Court, counsel for March cited the *de novo* nature of this Court's "standard of review" in certified question cases as authority for submitting a new affidavit. However, this Court reviews *issues of law de novo* in certified question cases— not issues of fact Therefore, the new affidavit, which asserts facts and characterizations that were not presented to or ruled upon by the district court, can be given no consideration by this Court. We proceed upon the stipulated facts in the District Court's order.

All such bonds shall have as surety thereon either some incorporated bonding and/or surety company authorized to carry on business in this state, or in lieu of such corporate surety the contractor may deposit as security for such bond with the said state commissioner of public institutions, county court, board of education, board of trustees or other legal body having authority so to contract, a sum in cash or bonds and securities of the United States of America or of the state of West Virginia of sufficient amount and value equal at least to the reasonable cost of materials, machinery, equipment and labor required for the completion of such contract. Immediately upon the acceptance of either of said bonds by the state commissioner of public institutions, county court, board of education and board of trustees, or other legal body, the bond shall be recorded by the secretary of such commissioner or other legal body, or by the proper designated custodian of the papers or records thereof, in the office of the clerk of the county court of the county or counties wherein such work is to be done and where such materials, machinery or equipment are to be delivered, and no such contract shall be binding and effective upon either party or parties thereto until such bond has been executed, delivered and recorded as aforesaid.

Nothing in this article shall be construed to give a lien upon such a public building or improvement as is mentioned in this section, or upon the land upon which such public building or improvement is situated.

This Court addressed the purpose, application, and construction of *W. Va. Code*, 38–2–39 [2004] in *Cecil I. Walker Machinery Co. v. Stauben, Inc.*, 159 W.Va. 563, 567–70, 230 S.E.2d 818, 820–21 (1976):

Liens against public projects have not been permitted. As a consequence, those who would be protected by mechanic's liens or materialmen's liens if the project were a private project have found their protection in statutes requiring bonds for their protection.

\* \* \*

It has been uniformly held that a bond given pursuant to a statute should be read as though given in literal compliance with the statute. Likewise, when the surety is a corporation and supplies bonds for a consideration, the courts will construe the obligations of the bond most strongly against the surety. [citations omitted.]

\* \* \*

Generally speaking, the courts have endeavored to extend the protection afforded by the statutory bond as far as reason and logic will permit.[3]

\* \* \*

A synthesis of the views expressed in the cases referred to above would seem to be that ... the statutory bond is to be liberally construed to provide protection[.]

▌ In the Syllabus of *Marsh v. Rothey*, 117 W.Va. 94, 183 S.E. 914 (1936), this Court discussed who could make a claim against the bond required by *W. Va. Code*, 38–2–39 [2004], stating:

Necessary material furnished for, or necessary labor performed on, a public structure under a contract with the general contractor or subcontractor, is protected by the bond required by Code, 38–2–39. Material supplied to, or labor performed for, a furnisher of material on a public structure is not so protected.[4]

---

**3.** This language from *Walker Machinery* is consistent with *Tug River Lumber Co. v. Smithey*, 107 W.Va. 482, 490, 148 S.E. 850, 853 (1929), where this Court stated:

Conceding that there is no right of lien against the school building, this bond, if only for the protection of the board, and not for the protection of laborers and materialmen, would be meaningless. In the terse words of one of our jurists, "Courts struggle to make public bonds answer public justice."

**4.** "The present statute, thus read, gives liens only to general contractors and subcontractors and persons contracting with them. Beyond those three classes, the statute affords no protection." *Rosenbaum v. Price Const. Co.*, 117 W.Va. 160, 164, 184 S.E. 261, 263 (1936).

A subcontractor, ordinarily, is one to whom the principal contractor sublets a portion or even all of the contract itself. *A materialman, ordinarily, is one from whom the principal contractor or a subcontractor secures material of a general type for use on the structure.*

(Emphasis added.) [5]

Nationally, a number of reported decisions have addressed the issue of whether a party who provides labor or materials to a public construction project should be classified as a "materialman" or as a "subcontractor"—for purposes of determining the availability of a construction bond to guarantee the payment of the party's supplier. Some cases involve federal courts applying the Miller Act, 49 Stat. 793, 794, as amended, 40 U.S.C. secs. 270a and 270b, which provides for similar bonds on certain federally-funded construction projects. Other cases involve state statutes similar to *W. Va.Code,* 38–2–39 [2004], sometimes referred to as "Little Miller Acts."

A recent and well-researched opinion discussing the subcontractor/materialman distinction, and particularly the issue of whether a subcontractor must have necessarily performed work at the construction site, is *Vulcraft v. Midtown Business Park, Ltd.,* 110 N.M. 761, 800 P.2d 195, 197 (1990). In *Vulcraft,* the court stated:

Two divergent lines of authority are urged upon us to define "subcontractor." One line requires that work must be done at the construction site for a party to qualify as a subcontractor. As a Louisiana court articulated its view:

[A] subcontractor is a worker who actually participates in the building or erection of the edifice. A materialman is one who supplies material either manufactured or fabricated for use in that building. If the fabricator of material does not engage in any process that incorporates the item furnished into the immovable under construction, he is a materialman. It matters not whether his product is procured from another

manufacturer and delivered unchanged to the building site or if it is shaped by him from other materials before it is delivered to the job site.

*Leonard B. Hebert, Jr. & Co. v. Kinler,* 336 So.2d 922, 924 (La.App.1976) [footnote and additional citations omitted]. The alternative view is articulated in *Theisen v. County of Los Angeles,* 54 Cal.2d 170, 183, 352 P.2d 529, 537–38, 5 Cal.Rptr. 161, 169–70 (1960) (in bank):

[T]he essential feature which constitutes one a subcontractor rather than a materialman is that in the course of performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such contract, not that he enters upon the job site and does the construction there. We are not here concerned with the mere furnishing of materials from which doors were to be constructed by the general contractor nor are we interested in the sale of standard stock-in-trade doors. Specifically we are dealing with a contract whereby the doors were to be fabricated according to the specifications of the prime contract and as a constituent part of the construction of the public improvement which was the subject of the contract. We do not accept the view of some other jurisdictions that to be a subcontractor one must install work at the site of the improvement. Rather, we conclude that one who agrees with the prime contractor to perform a substantial specified portion of the work of construction which is the subject of the general contract in accord with the plans and specifications by which the prime contractor is bound has "charge of the construction" of that part of the work of improvement and is a subcontractor although he does not undertake to himself incorporate such portion of the projected structure into the building.

(Citations omitted); see *Piping Specialties Co. v. Kentile, Inc.,* 229 Cal.App.2d 586,

---

**5.** In *Marsh v. Rothey, supra,* this Court found that a supplier of crushed stone was a materialman and not a subcontractor, where there was no

evidence that the stone had been crushed to a size unique to the project.

589, 40 Cal.Rptr. 537, 539 (1964) (emphasizing the meaning of a stock-in-trade item as being "whether or not the item is one which manufacturers stand ready to produce and deliver, on order, according to designs already in existence" and emphasizing meaning of substantial as "important" or "material").[footnote and additional citations omitted].

After a review of case law from across the nation, the *Vulcraft* court concluded:

We adopt, generally, the latter rule as enunciated in *Theisen* that does not require a subcontractor to have done work at the construction site, as being in accord with our statutory structure and precedent.

* * *

To qualify as a subcontractor, the party must perform some portion of the work for which the owner originally contracted. It is not necessary that the work be done at the construction site, but work must be performed to the contract's plans and specifications. The work can be performed on material supplied to another subcontractor of the contractor, but the material cannot be generic, stock, off-the-shelf items or items generally available without modification-it must be fabricated uniquely or specially by the contractor for the requirements of the particular project. [citations omitted]

The work performed must also be substantial. We are not concerned with a relatively small expenditure of labor in relation to a contract mainly for material. We note that the substantiality requirement accords with the statute's effect of creating privity with the owner. It gives notice that the supplier/subcontractor will be acting as an agent, allowing the owner to take protective steps to insure the party is responsible, and the requirement limits the scope of those able to file a lien.

*Vulcraft, supra,* 110 N.M. at 765–767, 800 P.2d at 199–201.

Minnesota addressed the subcontractor/materialman distinction in connection with a public construction bond in *Weyerhaeuser Co. v. Twin City Millwork Co.,* 291 Minn. 293, 191 N.W.2d 401 (1971). The *Weyerhaeuser* court stated:

As we have suggested, a basic question is whether the prime contractor can be expected to have notice of plaintiff's participation in the project. There is always a question of whether one who furnishes labor or material is so remote the prime contractor cannot reasonably protect his interest. It is for this reason that some courts have insisted on labor and material being furnished at the job site where the contractor can observe what is being done. The point at which the cutoff is appropriate must necessarily be somewhat arbitrary. Suffice it to say that the almost universal rule permits protection to materialmen who sell to subcontractors but does not allow recovery by those who sell standard products to materialmen.

In *Clifford F. MacEvoy Co. v. United States,* 322 U.S. 102, 108, 64 S.Ct. 890, 894, 88 L.Ed. 1163, 1168 (1944), a leading case which deals with the payment bond required from contractors by [Secs.] 1 and 2 of the Miller Act, 49 Stat. 793, 794, as amended, 40 U.S.C.A., secs. 270a and 270b, the United States Supreme Court summarized the problem thus:

* * *

'The Miller Act itself makes no attempt to define the word 'subcontractor.' We are thus forced to utilize ordinary judicial tools of definition. Whether the word includes laborers and materialmen is not subject to easy solution, for the word has no single, exact meaning. In a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor. In that sense Miller was a subcontractor. But under the more technical meaning, as established by usage in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen. * * *

'Practical considerations underlying the Act likewise support this conclusion. Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself. The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond, or otherwise, for the payment of those who contract directly with the subcontractors, [citations omitted]. But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman, who may be a manufacturer, a wholesaler or a retailer. Many such materialmen are usually involved in large projects; they deal in turn with innumerable sub-materialmen and laborers. To impose unlimited liability under the payment bond to those sub-materialmen and laborers is to create a precarious and perilous risk on the prime contractor and his surety. To sanction such a risk requires clear language in the statute and in the bond so as to leave no alternative. Here the proviso of Section 2(a) of the Act forbids the imposition of such a risk, thereby foreclosing Tomkins' right to sue on the payment bond.'

\* \* \*

 Two other Federal cases deserve comment: *United States for Use of Well-*

man Engineering Co. v. MSI Corp. (2 Cir.) 350 F.2d 285 (1965); *J.W. Cooper Const. Co. v. Public Housing Administration* (10 Cir.) 390 F.2d 175 (1968). In allowing recovery under the Miller Act to a remote supplier, the court in Wellman held the purchaser to be a subcontractor although the company did not perform any work on the job site. There, as in the instant case, the material furnished was built to specifications and was not generally available on the open market. A similar result was reached in the Cooper case where the items ordered were kitchen cabinets furnished according to plans and specifications.

Massachusetts and California have also passed on the question. *Holt & Bugbee Co. v. City of Melrose,* 311 Mass. 424, 41 N.E.2d 562, 141 A.L.R. 319, involved millwork. Recovery was allowed the remote supplier of lumber notwithstanding the fact the purchaser took no part in the installation of the paneling, rails, newel posts, trim, and stair stock which it built pursuant to contract with the prime contractor.[6] *Theisen v. County of Los Angeles,* 54 Cal.2d 170, 5 Cal.Rptr. 161, 352 P.2d 529 (1960), as in the instant case, involved the manufacture of doors. The California court, relying on two Minnesota cases, *Illinois Steel Warehouse Co. v. Hennepin Lbr. Co.,* 149 Minn. 157, 149 Minn. 157, 182 N.W. 994; and *Pittsburg Plate-Glass Co. v. Sisters of the Sorrowful Mother,* 83 Minn. 29, 85 N.W. 829, expressed a view with which we are in accord (54 Cal.2d [at] 183, 5 Cal.Rptr. at 169, 352 P.2d [at] 537[.][7]

291 Minn. at 295–299, 191 N.W.2d at 403–405 (footnotes omitted).[8]

---

**6.** A subcontractor is "one who has entered into a contract express or implied, for the performance of an act, with a person who has already contracted for its performance." And one who contracts to supply materials manufactured or processed especially for the general contractor and in accordance with special reference to his plans and specifications or those by which he is bound comes within that definition. It was not necessary that MacPhee should have undertaken to install the finished products in question in the city hall. The labor performed by him in milling the interior trim for the additions and alteration of the building was to

all intents and purposes work performed in its construction.
*Holt & Bugbee Co. v. City of Melrose,* 311 Mass. 424, 41 N.E.2d 562, 563 (1942). (internal citations omitted).

**7.** *See* the extended quotation from *Theisen* in *Vulcraft, supra.*

**8.** Both parties to the instant appeal argue that in the instant case, weight should be given to the terms that the parties used (or did not use) in their contractual documents. Infra points to the fact that the March purchase order—that set out

In *U.S. for Use and Benefit of Parker,* 477 F.Supp. 400, 411 (M.D.Pa.1979), the district court stated:

> One of the most important factors to consider is the nature of the material or service supplied by the alleged subcontractor to the prime contractor. For example, a party who supplies fungible goods which are a part of his general inventory, such as sand and gravel, and the production of which does not require a specialized or customized manufacturing process in order to meet specifications of the prime contract is generally held to be a material supplier rather than a subcontractor regardless of the relationship of the cost of the materials which he supplies to the cost of the entire project. *See, e.g. Brown & Root, Inc. v. Gifford–Hill & Co.,* 319 F.2d 65 (5th Cir. 1963); *United States ex rel. Pioneer Steel Co. v. Ellis Construction Co.,* 398 F.Supp. 719 (E.D.Tenn.1975). On the other hand, if an item is to be custom manufactured by

the purported subcontractor according to the specifications found in the prime contract and the purported subcontractor bears a portion of the responsibility for the design and fabrication of the goods including the responsibility to prepare shop drawings in accordance with prime contract specifications, then it is likely that the relationship between the prime contractor and the purported subcontractor is sufficient to justify recovery by the latter's material suppliers under the Miller Act. *See, e.g., United States ex rel. Gulfport Piping Co. v. Monaco & Son, Inc.,* 222 F.Supp. 175 (D.Md.1963), *Rev'd on other grounds,* 336 F.2d 636 (4th Cir.1964). Of course, custom manufacturing by itself is not sufficient. To a certain extent, every material supplier is required to provide to the prime contractor materials in accordance with contract specifications. Thus, in *Aetna Casualty & Surety Co. v. United States ex rel. Gibson Steel Co.,* 382 F.2d

specifications for the work that Infra was going to do—used the term "subcontract" to describe the parties' relationship. (March claims that its use of the term "subcontract" was an "error.") March and the Sureties counter with the claim that March only requires parties actually working on a job site to sign a standardized "subcontractor contract" form—and that this form was not used with Infra. Our research indicates that the use of a particular term in connection with a business relationship is not considered to be a dispositive factor when making the subcontractor/materialman distinction in connection with a public construction bond—although the use of a particular term may be entitled to some weight. This issue was discussed in *Unadilla Silo Co., Inc. v. Hess Bros., Inc.,* 123 N.J. 268, 586 A.2d 226 (1991):

> ... Unadilla's president, in his deposition, described both Unadilla and Eco as materialmen, contending that if Unadilla does not consider Eco to be a subcontractor, neither should this Court. In our view, Unadilla's self-classification is not controlling, especially because the terms "subcontractor" and "materialman" may be interpreted differently, depending on the context in which they are used. *See Lyle Signs v. Evroks Corp., supra,* 132 N.H. at 158, 562 A.2d at 787 (middle party described itself as a material supplier in correspondence to general contractor); *cf. United States ex rel. Consolidated Pipe and Supply Co. v. Morrison–Knudsen Co., supra,* 687 F.2d at 134 (fact that contractual instrument was styled "purchase order" not controlling on question whether supplier was subcontractor or materialman); *United States ex rel. Gulfport Piping Co. v. Mon-*

*aco and Son, Inc.,* 222 F.Supp. 175, 180–81 (D.Md.1963) (although government engineer's telegram referred to middle party as material supplier, court disregarded statement and looked to substance of contract), rev'd on other grounds, 336 F.2d 636 (4th Cir.1964).

\* \* \*

In determining whether a supplier of materials is a subcontractor within the meaning of the Bond Act, we apply a functional standard considering, among others, the following factors: (1) whether the material supplier agreed to perform a definite and substantial part of the same work that the general contractor was obligated to perform; (2) whether the work was performed according to plans and specifications in the original contract; and (3) whether the materials required off-site fabrication prior to installation at the job site. Further, a subcontractor protected by the Bond Act must have agreed to provide labor or materials for either the general contractor or one of its subcontractors. Although on-site work may be a factor in determining whether the material supplier performed a definite and substantial amount of the work called for in the original contract, on-site work is not a prerequisite to subcontractor status.

*Unadilla, supra,* 123 N.J. at 287–88, 586 A.2d at 236–237 [internal citations omitted].

It should be noted that whether a party is classified as a subcontractor or a materialman for purposes of a public construction bond has no significance for other legal purposes—such as the application of workplace safety laws—and *vice versa.*

615 (5th Cir.1967), the Court found a contractor-subcontractor relationship lacking between the prime contractor and the purported subcontractor because although the latter performed custom manufacturing, none of the items which it made were complex but rather consisted of simple components such as stairs and ladders. The Court did indicate, however, that the fact that the purported subcontractor was required to prepare the shop drawings and that it had no inventory of the items to be produced weighed on the side of a finding that a contractor-subcontractor relationship existed. *See also Miller Equipment Co. v. Colonial Steel & Iron Co.,* 383 F.2d 669 (4th Cir.1967), *Cert. denied,* 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968).

In *Sparks Const., Inc. v. Newman Bros., Inc.,* 51 Ala.App. 690, 694, 288 So.2d 749, 752–753 (*Ala.Civ.App.* 1974), the court found that a structural steel provider was a subcontractor for purposes of a public construction bond:

Applying the above stated reasoning to the instant case, it is clear that B & H was to furnish all structural steel, ornamental iron, and miscellaneous work for Sparks. All of the above was to be in strict accord with plans and specifications. The total order from B & H called for some $57,598.

* * *

This court is of the opinion that the agreement between Sparks and B & H was a substantial part of the overall contract between Sparks and the board of education, and that B & H was a subcontractor within the purview of Ala.Code, Tit. 50, [sec.] 16 (1940). Much of the work had to be custom fabricated to meet the specifications of the elementary school building under construction. We feel the purchase order agreement between Sparks and B & H adequately reflects a substantive portion of the overall contract, and further, served notice on Sparks that the material must be custom fabricated.

Since B & H is a subcontractor, Newman, being at least a materialman to the subcontractor, is entitled to the protection afforded by the bond. . . .

In another case involving the furnishing of structural steel for a public construction project, *LaGrand Steel Products Co. v. A.S.C,* 108 Idaho 817, 819, 702 P.2d 855, 857 (1985), the court stated:

In this case the central facts-undisputed or found by the trial court upon substantial evidence-are as follows. The prime contract between the State of Idaho and A.S.C. was approximately $14,600,000. The contract between A.S.C. and Steel Management totaled approximately $1,376,548. The purchase order between A.S.C. and Steel Management was a relatively complex document, making reference to provisions in the prime contract. Steel Management was to provide custom fabrication of the steel provided by LaGrand. This fabrication involved cutting beams to required length, drilling holes, welding plates, and prime painting. The work was not unduly complicated. It was performed exclusively at Steel Management's facility. Steel Management did not erect or supervise the erection of the fabricated steel on the job site.

Labor involved in the fabrication totalled approximately 10,000 man hours billed at a cost of $100,000. A.S.C. required Steel Management to submit shop drawings outlining the fabrication of the steel. Steel Management subcontracted this work to an engineering firm. Steel Management received progress payments as the fabrication work progressed, less five percent retainage held until all materials were incorporated into the work and accepted by the State. A.S.C. required and obtained personal guarantees of contract performance from the principals and owners of Steel Management.

These factors present a mixed picture-some auguring in support of subcontractor status and some against it. But in light of the subcontractor definition and its underlying purpose, we deem it particularly significant that the contract between A.S.C. and Steel Management embraced more than one million dollars and constituted approximately ten percent of the total prime contract in a major public works project. A contract of such economic di-

mension connotes a substantial, important relationship with the prime contractor. It is also noteworthy that the prime contractor deemed Steel Management's role in the project sufficiently important to secure personal performance guarantees. Considering these factors in conjunction with the others, we conclude Steel Management had a substantial and important relationship with the prime contractor. Accordingly, we hold that Steel Management was a subcontractor within the meaning of I.C. § 54–1927 *et seq.* LaGrand is entitled to recover on the bond.

In another structural steel case, *Illinois Steel Warehouse Co. v. Hennepin,* 149 Minn. 157, 160, 182 N.W. 994, 995 [1921], the court stated:

> Whether the Avery Company was a contractor or a materialman within the meaning of the lien law depends on the nature of the contract which it undertook to perform. It contracted to furnish a substantial part of the steel 'fabricated' as required by the plans and specifications. This necessarily required the company to do the work of 'fabrication,' or cause it to be done, and placed the company in the class of contractors as distinguished from the class of materialmen under the lien law. That the company, instead of performing the contract itself, performed it through a subcontractor did not relieve the company from its obligation to do the 'fabricating,' nor change its relation to the building from that of a contractor to that of a materialman. It follows that Boorman, to whom the contract was sublet by the Avery Company, and who actually performed it, was a subcontractor within the lien law.

And in yet another structural steel case, *Blue Tee Corp. v. CDI Contractors, Inc.,* 247 Neb. 397, 529 N.W.2d 16 (1995), the court stated:

> The issue in this case is whether Northwestern was a subcontractor or a materialman for the purposes of the Nebraska Construction Lien Act. If Northwestern was a subcontractor for CDI, Blue Tee is entitled to protection under the Nebraska Construction Lien Act as a supplier to a

subcontractor; if Northwestern was a materialman to CDI, Blue Tee is not entitled to a lien.

CDI was the general contractor for the construction of a department store-Dillard's at Oakview Mall in Omaha. CDI accepted Northwestern's bid to provide structural steel for the project. Northwestern ordered raw steel from Blue Tee. Blue Tee delivered the steel and billed Northwestern $108,070.09 for the material. The date of the last delivery was on or about November 1, 1990. The steel was fabricated by Northwestern off the construction site and was installed by Davis Erection Company.

According to Blue Tee's expert witness, John Rupprecht, steel fabrication is the process of cutting, drilling, plating, and otherwise altering raw steel sections to exact specifications such that the sections may be assembled into the framework of a building. Rupprecht also stated that, as in this case, fabrication must be done in a steel fabrication facility and cannot be done at a jobsite. He testified that, after steel has been fabricated for a particular project, it has only scrap value if it is not incorporated into that project or an identical project. Rupprecht also stated that the work completed by Northwestern constituted a definite and substantial portion of the project. Upon cross-examination, Rupprecht admitted that fabrication of steel could be as simple as cutting a piece of steel to a certain length.

\* \* \*

This court has previously attempted to define the differences between a subcontractor and a materialman. We have stated:

> [T]he essential feature which constitutes one a subcontractor rather than a materialman is that in the course of performance of the prime contract he constructs a definite, substantial part of the work of improvement in accord with the plans and specifications of such con-

tract, not that he enters upon the jobsite and does the construction there."

(Emphasis omitted.)

*Ideal Basic Industries v. Juniata Farmers,* 205 Neb. 611, 615, 289 N.W.2d 192, 195 (1980) (quoting 53 Am.Jur.2d Mechanics' Liens § 72 (1970)).

\* \* \*

The object of the mechanic's lien being to secure the claims of those who have contributed to the erection of a building, it should receive the most liberal construction to give full effect to its provisions.

\* \* \*

In the instant case, Northwestern cut, drilled, welded, and otherwise fabricated raw steel to the exact specifications required by CDI. Expert testimony established that Northwestern's work on the project constituted a substantial share of the construction of the department store. Despite the evidence that Northwestern was a materialman, we recognize the contribution of labor as the foremost indicium of subcontractor status.

247 Neb. at 403, 529 N.W.2d at 18–21.

In *U.S. for Use and Ben. of Conveyor Rental v. Aetna,* 981 F.2d 448, 451–452 (9th Cir.1992), the court stated:

Generally, courts have found the following factors weigh in favor of a subcontractor relationship: (1) the product supplied is custom fabricated; (2) the product supplied is a complex integrated system; (3) a close financial interrelationship exists between the companies; (4) a continuing relationship exists with the prime contractor as evidenced by the requirement of shop drawing approval by prime contractor or the requirement that the supplier's representative be on the job site; (5) the supplier is required to perform on site; (6) there is a contract for labor in addition to materials; (7) the term "subcontractor" is used in the agreement; (8) the materials supplied do not come from existing inventory; (9) the supplier's contract constitutes a substantial portion of the prime contract; (10) the supplier is required to furnish all the material of a particular type; (11) the supplier is required to post performance bond; (12) there is a backcharge for cost of correcting supplier's mistakes; and (13) there is system of progressive or proportionate fee payment.

Generally, cases have found the following factors tend to weigh in favor of a materialman relationship: (1) a purchase order form is used by the parties; (2) the materials come from preexisting inventory; (3) the item supplied is relatively simple in nature; (4) the contract is a small percentage of the total construction cost; and (5) sales tax is included in the contract price, [multiple footnotes citing cases omitted.]

In a structural steel case where the court found the company that provided the structural steel for the project was a materialman and not a subcontractor, *U.S. for Use and Ben. of Clark v. Lloyd T.,* 698 F.Supp. 665, 668 (S.D.Miss.1988), the court noted that the

... fabricated steel provided by Phoenix was considered in the industry to be standard, not complex, fabrication and in fact, "the structural requirements [. . . ] were so simple that the project did not require the designs to be approved or prepared by a structural engineer" [and the] structural steel provided by Phoenix was utilized only in the mezzanine area of the Project, an area accounting for only fifteen percent of the total Project size.

In *Miller Equipment Co. v. Colonial Steel & Iron Co.,* 383 F.2d 669 (4th Cir.1967), *cert. den.* 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968), another structural steel case, the court stated:

The District Court concluded that Colonial was not a subcontractor of Troitino, but simply a supplier of materials, thus excluding Miller from the coverage of the bond. The following subordinate findings account for the opinion of the District Court that Colonial was no more than a materialman:

\* \* \*

7. \* \* \* Little, if any, discretion was vested in Colonial as to the fabrication of the structural steel as the design and

computations required were derived from the drawings of the Engineers and the ASC Manual. Thus, the Court concludes that Colonial was merely a materialman in connection with the work on project 614.

Our opinion, however, is that despite the form of the written contract between Troitino and Colonial, Colonial in actuality was a subcontractor as envisaged by the Act and MacEvoy. Certainly Colonial was no ordinary materialman. The amount due it for successful performance of its contract with Troitino was $ 115,000.00, more than 15% Of the sum due Troitino under the prime contract and 64% Of item 20, a fundamental provision of that contract because it was the specification for structural steel. The Troitino–Colonial agreement called not for the mere supply of materials but for the custom fabrication of massive girders and their accessories, key and integral components of the bridge, designed and fabricated to mesh precisely in their final assembly on the job-site. See *Travelers Indem. Co. v. United States*, 362 F.2d 896 (9 Cir.1966); *United States v. MSI Corp.*, 350 F.2d 285 (2 Cir.1965); compare *United States for Use of Bryant v. Lembke Constr. Co.*, 370 F.2d 293 (10 Cir.1966). It is of little moment here that Troitino designated the Colonial agreement as a 'purchase order' for the steel. Nor is it surprising that Colonial neither contributed to the bond premium nor subscribed to Clause 21 and Standard Form 19–A. Troitino never asked it to do so. We cannot posit Colonial's status as materialman or subcontractor merely upon Troitino's neglect to enforce its contract with the government, or to require that all subcontractors contribute to the premium.

383 F.2d at 674.

■ Having reviewed the foregoing case law, we turn to the issues in the instant case. March and the Sureties made two principal arguments in the District Court as to why—under the undisputed facts recited in the District Court's order—Titan should be regarded as a materialman, and not a subcontractor:

... March and the Sureties assert that an entity's status as a materialman or subcontractor is contractually defined, and that, even if such status is not contractually defined, there is nonetheless a requirement that one physically perform work at the Project site to be deemed a subcontractor.

(District Court order certifying questions.)

Neither of these arguments is persuasive in the instant case.

March's and the Sureties' argument that in order to qualify as a "subcontractor" a party *must* perform work on the job site has been rejected by a wide range of state and federal jurisdictions, as demonstrated *supra*. These jurisdictions have concluded that a party who performs a substantial part of the contract for the principal contractor may be a subcontractor for purposes of a public construction bond, even if the contracted-for work is not performed on the job site itself. *See Vulcraft, supra.*

The reasonableness of this conclusion may be shown by imagining an instance where a public works contract calls for the construction and installation on a prepared site of a specialized, custom-made prefabricated building—and where the prime contractor for the project contracts with another company to create the building according to unique contract specifications, and to deliver the custom-built building to a terminal near the prepared site. Even though the company that custom-builds the building never goes on the site where the building will ultimately sit, it would be absurd to be required to treat that company as a mere "materialman," when that company in fact performed the majority of the contract. The plethora of cases cited hereinabove demonstrate that courts have readily and very reasonably rejected any such absurd construction of the legislative intent in enacting a public construction bond requirement.

As to March and the Sureties' argument that the parties' "contractual definition" of the terms "subcontractor" or "materialman" is binding—the discussion at note 8, *supra*, illustrates the even more uniform conclusion in the case law that it is the scope and nature of a party's contribution to a public construction project that is most important, although

how that contribution is labeled by the parties may be a factor to be considered in a court's analysis. *See* note 8, *supra; see also Miller Equipment, supra.*

 In accord with the foregoing reasoning and the foregoing-discussed case law, we conclude and hold that for purposes of the public construction bond statute, *W. Va.Code,* 38–2–39 [2004], a party need not necessarily perform work at the construction job site itself in order to be considered a subcontractor. To make the determination in a public construction bond case whether a party that furnishes labor or materials for the project should be classified as a subcontractor or as a materialman, a multifactorial analysis should be used, with no single factor being determinative. The core inquiry is whether the party in question takes from the prime contractor a specific and substantial part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen. *See Clifford F. MacEvoy Co. v. United States,* 322 U.S. 102, 108, 64 S.Ct. 890, 894, 88 L.Ed. 1163, 1168 (1944).

## IV.

### *Conclusion*

The District Court's question is:

Under *W.Va.Code,* 38–2–39 (2003), is a steel fabricator deemed to be a "subcontractor" where:

A. The steel fabricator enters a fixed-price contract with the general contractor of a public works construction project, pursuant to which the fabricator

i. Agrees to fabricate and deliver structural steel components conforming to the construction project's unique design specifications;

ii. Produces shop drawings for the fabricated steel components based on the project's engineering calculations and design specifications

iii. Submits its shop drawings for approval by the project's architect and general contractor before fabricating the structural steel components; and

iv. Delivers the fabricated steel components on a delivery schedule based on construction progress;

B. The steel fabricator performs all physical fabrication processes at its own facility, away from the project site; AND

C. The fabricated steel components are not fungible and not readily marketable without further modification?

Applying a multi-factorial analysis, this Court finds to be notable among the factual premises of the District Court's question the fact that Titan specially fabricated structural steel components that were created to the contract's unique design specifications and were central to the project's ongoing progress; that Titan also produced shop drawings for the fabricated steel components that had to be approved by the architect for the general contractor March; and that the project-specific structural steel components provided by Titan were not fungible products susceptible to ready use in other projects. Also notable is the substantial percentage of the contracted-for project (more than one million dollars on a twenty-million-dollar project) that was undertaken by Titan.

As the discussion and holdings in the foregoing-quoted cases illustrate *(see, e.g., Vulcraft, Sparks Const., LaGrand Steel, Illinois Steel, Blue Tee Corp., Miller Equipment, supra)* these factors combine to render inescapable the conclusion that Titan was far more than a "mere materialman" supplying a fungible product to the project. Titan was clearly a subcontractor for purposes of *W. Va.Code,* 38–2–39 [2004]. Therefore, this Court's answer to the District Court's certified question is "Yes."

Having answered the certified question, the instant case is dismissed from the docket of this Court and this Opinion is certified to the United States District Court for the Northern District of West Virginia.[9]

---

9. We have the benefit of *amicus curiae* briefs from the West Virginia Contractors' Association and the Surety and Fidelity Association of America. Both *amici* urge this Court not to rule in the instant case in a fashion that would inadvertently or improperly alter long-settled practices and understandings in the construction business. We adhere to this stricture. Our holding is

Certified Question Answered and Opinion Certified to the United States District Court for the Northern District of West Virginia.

squarely in line with the holdings of many jurisdictions, including the United States Supreme Court, and it recognizes no duty by a party to a construction or bond agreement that is not clearly spelled out in statutes that were enacted many years ago and recognized by courts across this nation.